[Cite as *BR Kettering Towne Ctr. L.L.C. v. Golden City Ballroom L.L.C.*, 2016-Ohio-5159.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| BR KETTERING TOWNE CENTER LLC | : | |
| | : | |
| | : | C.A. CASE NO.   26718 |
| Plaintiff-Appellee | : | |
| | : | T.C. NO. 11CV5717 |
| v. | : | |
| | : | (Civil Appeal from |
| GOLDEN CITY BALLROOM LLC | : |   Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___29th___ day of ___July___, 2016.

. . . . . . . . . .

CHARLES M. BLUE, Atty. Reg. No. 0074329, 401 E. Stroop Rd., Kettering, Ohio 45429
        Attorney for Plaintiff-Appellee

JAMES D. MILLER, II, Atty. Reg. No. 0088136, 7385 Far Hills Avenue, Dayton, Ohio 45459
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Golden City Ballroom ("GCB") appeals from a judgment of the Montgomery County Court of Common Pleas, which overruled in part and sustained in part the magistrate's decision and ordered that (1) BR Kettering Towne Center, LLC ("KTC") recover $47,270.42, plus post-judgment interest, in unpaid rent from GCB, and (2) GCB

recover the "floating floor" and mirrors it installed at the rented premises.[1]   Only the portion of the judgment relating to the unpaid rent and fees is at issue in this appeal.

{¶ 2} For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings.

## I.   Evidence of Lease Negotiations at Trial

{¶ 3} This matter was tried before a magistrate in January 2013.   With respect to the unpaid rent claim, Tracy Edwards, an employee of KTC's property manager, testified on KTC's behalf; Irina Kozheva, GCB's co-owner and vice president, testified for GCB. The parties also stipulated to certain facts and the admissibility of ten exhibits.   The testimony, stipulations, and documentary evidence at trial established the following facts.

{¶ 4} On December 30, 2004, GCB entered into a five-year lease with Center-Plex Venture to rent the premises located at 2078 East Dorothy Lane in Kettering.   (Exhibit I.) GCB took possession of the premises on February 28, 2005, and under the terms of the lease, the lease would expire on February 28, 2010.

{¶ 5} KTC acquired the deed to the commercial property on October 25, 2006. The parties stipulated that KTC is the successor-in-interest to Center-Plex Venture for purposes of the lease.

{¶ 6} The lease required GCB to pay a base rent, plus additional fees, including a common area maintenance (CAM) charge, a fire and liability insurance charge, a real estate tax charge, and a marketing fund charge.   The initial base rent was free for four months, $2,500 for the fifth and sixth months, and $3,000 for months seven through

---

[1] BR Kettering Towne Center filed a cross-appeal, but it moved to dismiss its cross-appeal on February 1, 2016.   We granted the motion on February 18, 2016.

twelve.   Each subsequent year charged a higher base rent based on cost per square foot of space rented (4,250 sq. ft.).   During the fifth year (March 2009 to February 2010), the base rent was $4,604.70 per month and the additional fees came to approximately $1,415 per month.

{¶ 7} The lease contained a holdover provision, Section 10.3, setting forth terms should GCB remain in possession after the expiration of the lease.   Section 10.3 provided:

> In the event Tenant remains in possession of the Leased Premises after the
> expiration of the tenancy created hereunder, and without the execution of a
> new Lease or written consent of Landlord, Tenant, at the option of Landlord,
> shall be deemed to be occupying the Leased Premises as a Tenant from
> month to month, at twice the Fixed Minimum and Percentage Rent, subject
> to all of the other conditions, provisions and obligations of this Lease insofar
> as the same are applicable to a month-to-month tenancy.

{¶ 8} Section 10.5 addressed the effect of waivers of default.   It stated: "No consent or waiver, expressed or implied, by Landlord to or of any breach of any covenant, condition or duty shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition or duty.

{¶ 9} Section 10.7, titled "Remedies Cumulative" further stated:

> * * * No delay or omission of Landlord to exercise any right or power arising
> from any default shall impair any such right or power or shall be construed
> to be a waiver of any such default or any acquiescence therein.   Neither
> the rights herein given to receive, collect, sue for or distrain for any rent or

rents, moneys or payments, or to enforce the terms, provisions and conditions of the Lease, or to prevent the breach of nonobservance thereof, or the exercise of any such right or of any other right or remedy hereunder or otherwise granted or arising, shall in any way affect or impair or toll the right or power of Landlord to declare the Lease Term hereby granted ended, and to terminate this Lease as provided for in this Lease, or to repossess without terminating the Lease, because of any default in or breach of the covenants, provisions or conditions of this Lease.

{¶ 10} Finally, the lease contained an anti-oral modification provision in Section 11.11. According to that Section, the lease incorporated all of the "negotiations, considerations, representations and understandings" between KTC and GCB. Section 11.11 further provided that the lease "may be modified or altered only by agreement in writing between Landlord and Tenant, and no act or omission of any employee or agent of Landlord or Tenant or of Landlord broker shall alter, change or modify any of the provisions hereof."

{¶ 11} On January 13, 2010, a little over a month before the lease was set to expire, Irina Kozheva, an owner/vice president of GCB, wrote a letter to KTC, acknowledging that the February 2010 end of their lease term was approaching, expressing its desire to remain a tenant, but stating that the current lease terms were "unworkible." (Exhibit V.) Kozheva requested a new monthly rent — including the lease rate and all fees, charges and taxes — of no more than $3,500 per month.

{¶ 12} In a letter dated January 22, 2010, Carol Wass of Continental Real Estate, the property manager of the premises and an agent of KTC, replied to Kozheva's request.

The letter, titled "Proposed lease renewal, Kettering Towne Center," stated, in relevant part:

> In communicating with the Landlord and a review of your letter of January 13, 2010; the Landlord is prepared to offer the following:
>
>> The landlord is willing to offer 6 months at the requested rate in your letter of January 13, 2010 and then the rate will go back after that time to the existing rate. This will be contingent upon a signed confidentiality agreement about the terms.
>
> If you are in agreement with the above, please sign below and I will have a more formalized document prepared.
>
> This letter is not intended to create any legal rights or obligations, but rather to summarize the basic terms in which Landlord and Tenant may enter into an agreement. No such rights or obligations shall take effect until the lease agreement has been fully executed by both parties.

(Exhibit IV.) Exhibit IV indicates that it was "agreed and accepted" by GCB on January 28, 2010; a signature and "Vice President" are on the signature line.

{¶ 13} As noted by the trial court, there was no evidence that a confidentiality agreement was ever signed or that any "more formalized documents" were ever prepared as a result of this letter. Nevertheless, Kozheva began making $3,500 monthly payments in reliance on the letter.

{¶ 14} On February 28, 2010, the lease expired. The parties stipulated that, "[f]rom March 1, 2010, to February 28, 2011, Golden City Ballroom remained in possession of the Premises as a holdover tenant."

{¶ 15} On April 1, 2010, Cassidy Turley, a commercial real estate services firm, became the property manager for KTC. Tracy Edwards, an employee of Cassidy Turley, managed the premises as part of her duties. Edwards testified that she received a file regarding GCB from the previous property manager, and she discovered that the lease had expired. Edwards testified that she considered them to be "holdover tenants," liable for the holdover amount specified in Section 10.3 of the lease. She further testified that, when she became property manager, GCB was paying $3,500 a month in rent.

{¶ 16} Edwards contacted GCB and was informed that GCB "had reached an agreement to just pay $3,500 a month gross through the previous property management company." Edwards asked GCB to "send me copies of what they had so that I could do further research and figure out where we were in the process." GCB provided documentation (a copy of the January 22 letter) to Edwards.

{¶ 17} Edwards's testimony, as property manager for KTC, and Kozheva's testimony on behalf of GCB differed on what occurred between Edwards's receipt of the documentation and October 2010.

{¶ 18} Edwards testified that, after she received a copy of the signed January 22 letter from GCB, she called KTC and asked if a lease had ever been issued with the terms in the letter. She reported that KTC responded that it had never received a copy of the letter (Exhibit IV) and had not agreed to issue any lease with those terms.

{¶ 19} Edwards testified that, after communicating with KTC, she again contacted GCB and spoke with the officer manager; the officer manager indicated that the owners were out of the country due to a family emergency. Edwards testified that she told the office manager that GCB was a holdover tenant, liable for double rent plus expenses, and

she told the officer manager that the rent needed to be brought to date, so that they "could enter lease negotiations and get all of the paperwork corrected." (Tr. 12.)

{¶ 20} Edwards indicated that the May rent had not been paid, and that she had asked GCB for $3,500; Edwards testified that the amount was brought current in September 2010. When asked why she had demanded $3,500 instead of the holdover rent amount, Edwards stated, "The understanding was once the 3,500 was caught up, was that, the owner [KTC/landlord] would authorize an agreement providing Golden City Ballroom with a period of time where they would not be liable for expenses, and that they would waive the holdover period because they would be signing an extension of their lease." Edwards testified that, after the rent was brought current in mid-September, Cassidy Turley began to negotiate a new lease between KTC and GCB.[2]

{¶ 21} In contrast, Kozheva testified that, after sending the documentation to Edwards, she did not hear anything back from KTC until October 2010, when she received a lease proposal from KTC. Kozheva testified that she was anxious to get in touch with KTC about the lease, that she called KTC and left messages several times, that her business partner was pushing her to resolve the matter, and that they were on a month-to-month payment plan and had "no idea" what was going on. (Tr. 56.) Kozheva stated

---

[2] Edwards's testimony regarding GCB's balance is not entirely consistent with the account ledger (Ex. II), which the parties stipulated "accurately records credits for all payments made by Golden City Ballroom to BR Kettering Towne Center, LLC, during the period shown, as well as the security deposit paid by Golden City Ballroom."

The account ledger reflects that no payment was made in May 2015 and shows an additional payment of $3,500 on September 15, 2010. The September payment brought GCB's account current only if KTC charged GCB $3,500 per month beginning on March 1, 2010. The ledger shows what GCB would owe with GCB being charged the holdover rent and fees beginning on March 1, 2010; the ledger's balance after the September 15 payment was $51,061.52.

that GCB had an office manager and receptionist, but that neither of those individuals had anything to do with billing or legal matters.

{¶ 22} On October 15, 2010, Cassidy Turley sent a proposal for a three-year lease with a base rent of $3,500 gross for six months, $3,500 with triple net operating expenses for months 7-12, and $4,200 with triple net operating expenses for the second and third years. (Ex. VIII.) Edwards stated that the agreement would be backdated to the beginning of the holdover period. Both Kozheva and Edwards testified that GCB did not accept this proposal.

{¶ 23} Cassidy Turley sent GCB a second proposal in November 2010. (Ex. VII.) The second proposal was for a three-year lease with base rent of $3,500 gross for the first nine months, $3,500 with triple net operating expenses for months 10-16, and $4,200 with triple net operating expenses for months 17-36. At the end of the proposal, there is a signature indicating that the proposal was accepted by GCB and the signatory's title is stated as "vice president." However, the acceptance is dated November 2, 2010, prior to the typewritten date at the top of the proposal (November 17, 2010). Edwards did not recall receiving an executed copy of the second proposal; no lease was prepared with those terms.

{¶ 24} On December 21, 2010, Edwards sent GCB a letter, indicating the "2011 Operating Expenses Budget" had been finalized. The letter stated that, commencing January 1, 2011, GCB's new rental amount would be $4,494 per month consisting of $3,500 for base rent, $318 for CAM, $629 for real estate taxes, and $46 for insurance. (Ex. X.) Edwards testified that these amounts were based on her "understanding that the parties were nearing an agreement to execute a new lease and that the rent would

be remaining at 3,500 into some point at 2011." (Tr. 19.) Kozheva testified that she did not sign a new lease after receiving this letter.

{¶ 25} Kozheva testified that, after receiving the December 2010 letter, GCB already knew that it could not afford rent plus triple net, so she and her business partner began looking for another place to lease. GCB found a location in Centerville with more favorable terms, and provided KTC 30 days' notice that it would be vacating the premises by February 28, 2011.

{¶ 26} On January 25, 2011, KTC sent GCB a letter acknowledging receipt of GCB's notice to leave the property, confirming that GCB would be vacating the property on February 28, and notifying GCB that it owed KTC past rent in the amount of $87,245.77. (Ex. III.) KTC indicated that, beginning in March 2010, GCB had been required to pay double rent ($4,604.72 x 2) plus a triple net charge of $1,585.67 per month, for a monthly total of $10,795.07 per month. (Eleven months at $10,795.07 per month amounted to $118,745.77.) KTC stated that GCB had paid only $3,500 per month from March 2010 through November 2010, for a total of $31,500 in payments, and had not paid any rent in December 2010 and January 2011. KTC concluded that GCB owed past due rent of $87,245.77 ($118,795.77 - $31,500).

{¶ 27} Edwards testified that GCB did not return the keys to the premises, and she was uncertain when the property was actually vacated. Kozheva testified that GCB vacated the premises on February 28, but GCB employees went back on March 1, with KTC's agreement, to remove the hardwood floor and mirrors that GCB had installed. (Additional testimony was presented about the installation and attempted removal of the hardwood floor and mirrors; that testimony is not relevant to this appeal.)

**{¶ 28}** In August 2011, KTC brought suit against GCB, seeking unpaid rent and fees that had allegedly accrued during a holdover period after the expiration of the parties' lease. KTC also sought interest on the unpaid amounts and reasonable expenses and attorney fees. GCB denied that it owed any rent, and it filed counterclaims alleging that KTC had improperly prevented GCB from removing a custom wood dance floor and custom mirrors from the premises.

## II. The Magistrate's and the Trial Court's Rulings

**{¶ 29}** On March 7, 2013, the magistrate found in GCB's favor on both KTC's complaint and GCB's counterclaims.[3] With respect to KTC's claim, the magistrate held that the lease had been expressly modified for six months following the expiration of the lease and that KTC had implicitly agreed to an additional six-month modification for the second six-month period.

**{¶ 30}** With respect to the first six-month period after the lease expired, the Magistrate stated:

Just prior to the expiration of the lease term, Defendant, via letter (Ex. vi), requested modification of the lease terms, specifically, reduction of the rent to $3,500.00 per month. Plaintiff, via letter (Ex. iv), indicated that it was willing to offer 6 months at the requested rate "and then the rate will go back after that time to the existing rate," contingent upon execution of a confidentiality agreement. The proposal letter indicated that Plaintiff would prepare the necessary paperwork. These terms were accepted by

---

[3] Because GCB's counterclaims are not at issue on appeal, we will address only the magistrate's and the trial court's decisions concerning the unpaid rent and fees, and we will not discuss the counterclaims.

Defendant on January 28, 2011 in writing (ex. iv). Plaintiff never prepared the agreed upon paperwork. Nonetheless, in reliance upon Plaintiff's representations, Defendant began paying (and Plaintiff accepted) rental payments in the amount of $3,500.00 per month. According to Exhibit 2, Defendant made the following payments:

| | |
|---|---|
| March 2, 2010 | $5,399.51 |
| April 9, 2010 | $3,500.00 |
| April 29, 2010 | $3,500.00 |
| June 2, 2010 | $3,503.97 |
| June 28, 2010 | $3,500.00 |
| August 1, 2010 | $3,509.86 |
| August 31, 2010 | $3,500.00 |

These amounts were accepted by Plaintiff and there is no indication that Defendant was informed that it was behind on rent or that Plaintiff sought to collect the "holdover rent" in the amount set forth in the original Lease Agreement. Accordingly, the Magistrate finds that, although Plaintiff failed to prepare the agreed upon documents, the parties['] actions indicate that there was a modification of the Lease Agreement for the six months following expiration of the original lease term.

{¶ 31} The magistrate further explained its conclusion that the parties had implicitly modified the lease for the second six-month period, as follows:

In October, 2010, the parties began negotiating for an additional lease term. However, both the October 2010 and the November 2010

proposals were rejected by Defendants. During this time, Defendant continued to pay, and Plaintiff continued to accept without conditions, rental payments in the amount of $3,500.00. The Magistrate notes that the December 21, 2010 letter from Cassidy Turly [sic], the property management firm acting on Plaintiff's behalf, suggests that [GCB] would be liable for additional charges in excess of the "base rent" of $3,500.00. However, based upon Ms. Edward's testimony that this letter was a form letter generated and sent to all tenants at Kettering Towne Center, the Magistrate does not find the letter to reflect the understanding of the parties. Rather, the Magistrate finds that there was an implied modification of the Lease Agreement, which extended through February of 2011. This implied modification is evidenced by Plaintiff's acceptance of the following payments:

| | |
|---|---|
| September 15, 2010 | $3,500.00 |
| October 22, 2010 | $3,505.18 |
| November 1, 2010 | $3,500.00 |
| January 24, 2010 | $3,500.00 |
| February 15, 2010 | $3,500.00 |
| February 28, 2011 | $4,072.00 (Security Deposit) |
| March 22, 2011 | $20.94 |

The first and only time Plaintiff indicated that it would not accept rental payments in the $3,500.00 amount was the letter dated January 25, 2011. (The Magistrate notes that Section 10.1 of the Lease Agreement requires

Plaintiff to notify Defendant of any default on rent or other payments due under the Lease Agreement.) Nonetheless, even after this letter was sent, Plaintiff accepted the February rental payment in the amount of $3,500.00. Thus, the Magistrate finds that the parties' conduct indicates that there was more likely than not a modification of the Lease Agreement whereby Plaintiff agreed to accept $3,500.00 per month as the total amount of "holdover rent." Failure to find modification under these circumstances would result in injury to Defendant, who continued to occupy the premises in reliance upon Plaintiff's acceptance of the $3,500.00 rental payments. Although the parties originally intended that Plaintiff would memorialize their agreement in a written Lease, Plaintiff failed to perform according to the parties' agreement, yet continued to accept performance by Defendant in the form of reduced rent payments. It would be unfair to penalize Defendant for Plaintiff's failure to formalize the expressly agreed upon 6 month modification or the additional 6 month implied modification.

{¶ 32} KTC objected to the magistrate's decision, asserting, in part, that the magistrate erroneously concluded that the parties' conduct amounted to a modification of the lease agreement.

{¶ 33} On December 3, 2014, the trial court overruled in part and sustained in part KTC's objections. The trial court first addressed whether an oral modification of the original lease between the parties was permissible. The trial court disagreed with the magistrate that the original lease permitted oral modifications. The trial court cited Section 11.11 of the lease, which stated that, in part: "All negotiations, considerations,

representations and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord and Tenant, and no act or omission of any employee or agent of any employee or agent of Landlord or Tenant or of Landlord broker shall alter, change or modify any of the provisions hereof." The court also noted that the holdover provision required a new lease or written consent of the landlord to alter the holdover terms.

**{¶ 34}** The trial court nevertheless found that the "no oral modifications" clause could be waived by the actions of the parties. The court further noted, however, that Section 10.7 of the lease constituted an anti-waiver provision, barring consideration of KTC's failure to immediately demand the holdover rent amount.

**{¶ 35}** Considering the evidence at the hearing, the trial court concluded that Exhibit IV, the January 22, 2010 letter, demonstrated that KTC accepted a modification of the lease, at least for the first six months following the expiration of the original lease term. The trial court discussed Edwards' testimony that she informed a person at GCB that there was no lease modification and had advised GCB that it needed to become caught up on their $3,500 payments. The trial court found that this testimony "shows that the intention of Plaintiff's [sic] at this time was to require Defendant's [sic] to become current on making $3,500 monthly payments, in return for which the parties could enter into negotiations." The trial court found that KTC accepted a modification of the lease, at least until GCB's account was brought current and negotiations could begin in September 2010.

**{¶ 36}** The trial court further found, however, that GCB's proposed monthly rent of $3,500 was not acceptable to KTC beginning in September 2010. The court noted that

KTC "consistently demanded additional compensation in return for allowing rent to temporarily remain at $3,500 gross; in both lease proposals they [sic] demand a period of time where Defendant would pay triple operating expenses."

**{¶ 37}** The trial court further found that GCB did not reasonably rely on any purported modification of the rental amount of $3,500 from September 2010 to February 2011. The court reasoned:

> * * * Ms. Kozheva apparently viewed the agreement between her and Plaintiff as the first six months at $3,500, followed by a month-to-month tenancy at $3,500. This view of a month-to-month tenancy at $3,500 is not supported by any of the evidence, and is indeed contradicted by it. Ms. Edwards was clear in her April or May 2010 phone call that they were not agreeing to a permanent agreement for month-to-month tenancy at $3,500, but instead that Plaintiff merely wanted Defendant to become caught up so that negotiations between the parties could begin. If a month-to-month agreement for $3,500 was acceptable to Plaintiff, then no negotiations would have been necessary, and no further lease proposals would have been sent.
>
> The October 15, 2010 and November 17, 2010 lease proposals also made it clear that Ms. Kozheva's view of a month-to-month tenancy was not correct. Both proposals contain language that makes it clear further agreements between the parties must be in writing. "This proposal is for informational purposes only and is contingent all terms contained within shall be considered nonbinding until execution of a mutually acceptable

lease document." (And, unlike the January letter, these proposals contain no language that promises Plaintiff will take the next step in formalizing the agreement, which could reasonably induce Defendant into reliance). Although both proposals offer a gross monthly rent of $3,500 for a period of time, both also include a period of time where Defendants would pay triple operating expenses. Ms. Kozheva wants to enjoy the benefit of $3,500 monthly rent, without the Plaintiff's demanded cost of paying triple operating expenses.

Although the Court has already found that the December 21, 2010 letter from Plaintiff does not accurately reflect the understanding of the parties, it should be noted that Defendant's attempts to use this letter to bolster their claim of a $3,500 monthly rental agreement are completely nonsensical. The letter, though it does list the base rent as $3,500, also includes taxes and fees, making the total rent $4,494.00. This letter therefore cannot be said to have reasonably induced Defendant to rely on an agreement for $3,500 gross monthly rent.

Similarly, Defendant's reliance on Plaintiff's lease proposals backdating the rent to cover the months since the term of the original lease expired is misplaced. This backdating does not necessarily show a waiver of holdover rent. Instead, it is an inducement Plaintiff offers to convince Defendant to enter into a new lease. If Plaintiff had indeed waived their holdover rights entirely and was content with Ms. Kozheva's view of a month-to-month rent at $3,500, then no negotiations or lease proposals,

particularly ones that offered different terms and carried careful legal disclaimers, would be necessary.

No action of the Plaintiff after September 2010 could be reasonably relied upon as a modification of the lease.   At most, their actions showed a willingness to modify the lease, if Defendant assented to several demands.

(Citations to exhibits omitted.)   The trial court concluded that, from September 2010 to February 2011, KTC was entitled to rents and fees as set forth in the holdover provision of the lease.

**{¶ 38}** On May 22, 2015, the trial court issued a final judgment entry consistent with its December 3, 2014 decision.   With respect to the unpaid rent and fees, the court entered judgment in favor of KTC in the amount of $47,270.42, plus interest.   Although not expressly calculated by the trial court, this amount appears to be the difference between six months of rent at $10,795.07 ($64,770.42) and five months of payments of $3,500 ($17,500).[4]

**{¶ 39}** GCB appeals the trial court's judgment, challenging only the trial court's monetary judgment in favor of KTC for unpaid rent and fees.

### III. Holdover Rent to KTC for Second Six-Month Period

**{¶ 40}** GCB's assignment of error states:

The trial court erred by overruling the magistrate's decision with respect to

the parties' modification of the lease and/or Plaintiff-Appellee's waiver of the

holdover provision.

---

[4] The trial court's judgment did not account for KTC's retention of GCB's security deposit or the CAM, tax, and insurance reconciliation charges that are reflected on Exhibit II.

{¶ 41} In its appellate brief, GCB claims that the trial court erred in construing the terms of the lease as prohibiting a waiver of the holdover provision. It asserts that Section 10.5, the "Effects of Waivers of Default" provision, expressly permitted KTC to waive lease terms. GCB further argued that Section 10.7, which contains anti-waiver language, made the lease's terms regarding waiver ambiguous and, since KTC drafted the document, the terms should be interpreted in favor of GCB, thus allowing for waiver of the holdover provision. Finally, GCB contends that KTC waived by estoppel the holdover provision by continuing to accept GCB's $3,500 rent payments throughout GCB's month-to-month tenancy.

{¶ 42} KTC responds that Sections 10.5 and 10.7 "pertain to and are intended to address two different situations," and the clauses "do not in any way contradict one another, nor do they render each other ambiguous." KTC further asserts that the anti-waiver provision in Section 10.7 precludes any claim of waiver by estoppel.

{¶ 43} "Leases are contracts and are subject to traditional rules of contract interpretation. 'Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.' *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 313 N.E.2d 374, paragraph one of the syllabus; *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499, 1992-Ohio-28. 'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.' *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph two of the syllabus (superseded by statute on other grounds). The construction of a written contract is a matter of law for the court.

*Id.* at paragraph one of the syllabus." (Some citations omitted.) *EAC Properties, L.L.C. v. Brightwell*, 10th Dist. Franklin No. 10AP-853, 2011-Ohio-2373, ¶ 13.

**{¶ 44}** The modification of a contractual term is distinct from the waiver of a contractual term. A modification to a contractual provision is an agreement by the parties to change or modify the term in question. "Oral modification of a written contract must be supported by new and distinct consideration." *Coldwell Banker Residential Real Estate Services v. Sophista Homes, Inc.*, 2d Dist. Montgomery No. 13191, 1992 WL 303073, * 3 (Oct. 26, 1992), quoted by *Ayers v. Burnett*, 2d Dist. Clark No. 2013-CA-88, 2014-Ohio-4404, ¶ 15. In contrast, waiver is "a voluntary relinquishment of a known right." *Arnett v. Bardonaro*, 2d Dist. Montgomery No. 25371, 2013-Ohio-1065, ¶ 42, citing *Glidden Co. v. Lumbermans Mut. Casualty Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, 861 N.E.2d 109, ¶ 49. A party who has waived its right to enforce a contract term can revoke the waiver, absent prejudice to the other party. *Cleveland Thermal Energy Corp. v. Cleveland Electric Illuminating Co.*, 8th Dist. Cuyahoga No. 80312, 2002-Ohio-3904, ¶ 28.

**{¶ 45}** Sections 10.5 and 10.7 of the parties' lease addressed waiver. Section 10.5 contemplated that KTC may waive a covenant, condition or duty imposed by the lease, but, a waiver of a lease term was not a permanent change to the terms of the contract. Section 10.5 indicated that the waiver of "any breach of any covenant, condition or duty" shall not be construed as the waiver of any other breach of the same or other covenant, condition, or duty.

**{¶ 46}** Section 10.7, titled "Remedies Cumulative," limited how waiver may occur. It stated, in relevant part, "No delay or omission of Landlord to exercise any right or power

arising from any default shall impair any such right or power or shall be construed to be a waiver of any such default or any acquiescence therein." In other words, waiver could not be inferred merely from KTC's delay or failure to exercise a right or power provided by the lease.

{¶ 47} GCB asserts that Sections 10.5 and 10.7, read together, create an ambiguity about whether waiver is permitted. We find nothing ambiguous about these two sections of the lease. And, the two sections may be read together without creating any inconsistency.

{¶ 48} KTC asserts that the anti-waiver provision in Section 10.7 precludes a claim of waiver by estoppel. However, by its language, Section 10.7 does not prohibit KTC from waiving provisions of the lease. Rather, as KTC stated in its appellate brief, "Section 10.7 provides that mere delay in exercising a right does not constitute a waiver of that right." Nothing in Section 10.7 – or any other part of the original written lease -- precludes waiver by affirmative conduct by KTC.

{¶ 49} GCB contends that KTC waived by estoppel the holdover provision by continuing to accept GCB's $3,500 rent payments throughout GCB's month-to-month tenancy. We disagree. And while not an issue on appeal, we find a discussion of the first six-month period following the expiration of the parties' written lease to be helpful to our discussion of the second six-month period.

{¶ 50} As quoted above, the lease's holdover provision, Section 10.3, provided:

In the event Tenant remains in possession of the Leased Premises after the

expiration of the tenancy created hereunder, and without the execution of a

new Lease *or written consent of Landlord*, Tenant, at the option of Landlord,

shall be deemed to be occupying the Leased Premises as a Tenant from month to month, at twice the Fixed Minimum and Percentage Rent, subject to all of the other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.

(Emphasis added.)

{¶ 51} It is undisputed that GCB remained in possession of the premises following the expiration of the 2005 lease, and no new lease was executed. However, the parties' written exchange in January 2010 reflected an understanding that, with KTC's consent, GCB would continue its occupancy of the leased premises, beyond the expiration of the lease, if necessary, under terms that were different than the holdover provision. The January 22, 2010 correspondence from Carol Wass of Continental Real Estate, the property manager, indicated that KTC was willing to offer a new lease with 6 months at $3,500 per month and then the "existing rate," which was base rent of $4,604.70 per month, plus additional fees that came to approximately $1,415 per month. GCB accepted KTC's proposed terms, and KTC was to draft "a more formalized document" to be execute by the parties.

{¶ 52} The language of the January 22 letter made clear that a new written lease was required and that the letter should not be construed as creating a contract between the parties or a modification of the original lease's terms. However, the letter does indicate that the parties had reached an understanding as to new rental rates, and in light of KTC's indication that it would prepare a "more formalized document," the letter constituted written consent for GCB to remain in the leased premises while KTC prepared a formal contract (i.e., lease) consistent with the parties' understanding. By granting

consent for GCB to remain on the premises while it prepared a formal lease agreement, KTC waived its right to enforce the holdover rent provision in the original lease. KTC's acceptance of $3,500 in monthly rent from GCB during the first six-month period following the expiration of the lease was additional evidence that the holdover lease amount was waived.

{¶ 53} However, at the end of the first six-month period following the expiration of the lease, GCB had no reasonable expectation that KTC would continue to accept $3,500 in rent. KTC's January 22, 2010 proposal, to which GCB agreed, indicated that GCB's rent would increase after six months to the then-existing rate (i.e., the January 2010 rate). Although KTC did not demand more than $3,500 from GCB beginning in September 2010, nothing in KTC's conduct indicated that it would accept $3,500 as payment in full from September 2010 onward.

{¶ 54} Cassidy Turley became KTC's property manager in April 2010. As found by the trial court, Edwards's telephone communication with GCB in April or May 2010 indicated that KTC had not agreed to a permanent month-to-month tenancy at $3,500. Edwards further testified that, after GCB fell behind on its May rent, KTC wanted GCB to become caught up on its $3,500 rent so that negotiations between the parties could begin on the terms of a new lease.

{¶ 55} In October 2010, KTC sent a lease proposal to GCB, which offered $3,500 for the first six months (consistent with the January 2010 correspondence), with the rental amount increasing to $3,500 with triple net operating expenses for months seven through twelve and $4,200 with triple net operating expenses for the next two years. KTC sent a different lease proposal in November 2010, which proposed $3,500 for months one

through nine, $3,500 with triple net operating expenses for months 10 through 16, and $4,200 with triple net operating expenses for months 17 through 36. Both proposals contained language that made clear that the proposals were non-binding until the execution of a mutually acceptable lease.

{¶ 56} On December 21, 2010, Edwards sent a letter to GCB, stating that, beginning January 1, 2011, GCB's new rent would be $3,500 plus operating expenses, for a total rent of $4,494. Nothing in the record indicates that the parties had reached an agreement to this effect. Moreover, these terms include operating expenses, which GCB asserts were waived by KTC. The trial court reasonably found that the December 2010 letter "cannot be said to have reasonably induced Defendant to rely on an agreement for $3,500 gross monthly rent." Based on the evidence at the bench trial, we agree with the trial court that KTC did not agree to accept $3,500 gross in rent for the second six-month period following the expiration of the original lease. The trial court did not err in overruling the magistrate's ruling in this respect.

{¶ 57} However, we do not agree with the trial court's legal conclusion that GCB was required to pay the amount of holdover rent set forth in Section 10.3 during the second six-month period. As stated above, KTC waived the holdover rent by consenting to GCB's continued occupancy of the leased premises while lease terms were being finalized. The parties understood when that waiver occurred that GCB would pay $3,500 for six months and then the January 2010 rate ($4,604.70 per month plus the additional fees) thereafter. KTC had the right to revoke the waiver of the holdover provision, with sufficient notice to GCB, but there is no evidence in the record that it did so. KTC did not agree to accept $3,500 for the second six-month period following the expiration of the

original lease, but it also did not inform GCB that it was revoking its written consent for GCB to occupy the premises at the January 2010 rate while lease terms were being negotiated and finalized. Based on the evidence at the bench trial, as found by the trial court, KTC was entitled to rent at the January 2010 rate for the second six-month period following the expiration of the original lease.

{¶ 58} GCB's assignment of error is overruled to the extent that it asserts that the trial court erred in overruling the magistrate's decision that KTC was not entitled to additional rental payments from GCB; the trial court correctly found that KTC was entitled to unpaid rent for the second six-month period following the expiration of the original lease. However, GCB's assignment of error is sustained to the extent that it claims that the trial court erred in awarding KTC six months of rental payments at the holdover rate set forth in Section 10.3 of the original lease; for that six-month period, KTC was entitled to rent at the January 2010 rate.

## IV. Conclusion

{¶ 59} The portion of the trial court's judgment awarding $47,270.42, plus post-judgment interest, in unpaid rent to KTC will be reversed, and the matter will be remanded to the trial court for recalculation of the amount of unpaid rent due to KTC for the second six-month period following the expiration of the original lease. In all other respects, the trial court's judgment will be affirmed.

. . . . . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Charles M. Blue
James D. Miller, II
Hon. Richard Skelton