[Cite as *Iron Horse Bar & Grill, L.L.C. v. GGJ Triune, PLL*, 2024-Ohio-284.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

The Iron Horse Bar and Grill, LLC

    Appellant

v.

GGJ Triune, PLL

    Appellee

Court of Appeals No.  OT-23-002

Trial Court No.  20CV328

**<u>DECISION AND JUDGMENT</u>**

Decided:  January 26, 2024

* * * * *

Mark M. Mockensturm, Brandon Rehkopf, Kevin C. Urtz, and
Blanca N. Wheeler, for appellant.

Henry Schaefer, for appellee.

* * * * *

**SULEK, J.**

**{¶ 1}** Appellant The Iron Horse Bar and Grill, LLC ("Iron Horse"), appeals the

judgment of the Ottawa County Court of Common Pleas, following a bench trial, which

awarded judgment in favor of appellee GGJ Triune, PLL ("GGJ"), on Iron Horse's claim

for breach of contract.  Because the trial court's finding that GGJ did not breach the

contract is against the manifest weight of the evidence, the trial court's judgment is reversed.

## I. Factual Background and Procedural History

{¶ 2} On March 1, 2013, Iron Horse entered into a lease agreement with GGJ to lease property in Ottawa County, Ohio, on which Iron Horse would operate a restaurant. In recognition that the property needed substantial renovations before it could be used, the lease provided that the monthly rent of $1,800.00 would be waived for the first three months.

{¶ 3} Due to the extent of the renovations and the difficulty of obtaining the necessary permits from the county, Iron Horse was not prepared to open after the initial three months. Iron Horse, however, continued to work on the property and continued to not pay rent.

{¶ 4} In October 2013, GGJ inquired about Iron Horse's progress. The parties dispute whether Iron Horse responded that it needed additional financing to complete the renovations. But in either event, on October 22, 2013, Garry Miller, the owner of GGJ, personally loaned $30,000.00 to Iron Horse. The promissory note listed Iron Horse's restaurant equipment as collateral for the loan.

{¶ 5} Subsequently, on or around December 30, 2013, GGJ attempted to lock Iron Horse out of the premises. The police were called, and Iron Horse was able to remain on the property. Sometime in January or February 2014, GGJ then posted a Notice to

2.

Vacate the Premises for "failure to pay rent" and "continued occupation of premises without lease." Iron Horse never opened for business. On February 27, 2014, Iron Horse formally returned the premises to GGJ without ever having made any rent payments.

{¶ 6} On October 14, 2020, Iron Horse filed the complaint against GGJ for breach of contract. The matter proceeded to a bench trial on May 16, 2022.

{¶ 7} At the trial, John Shepler, one of the owners of Iron Horse, testified. Shepler stated that he formed Iron Horse with Tami Habel as a project for him to work on in his retirement. In preparation for opening, Iron Horse purchased $30,000 worth of restaurant equipment from a recently closed restaurant and entered into a lease agreement with GGJ. Several terms of the lease agreement are relevant here:

3. Rent.

The monthly rental for the term of the original lease shall be One Thousand Eight Hundred Dollars ($1,800.00) per month, a rate of four dollars fifty cents ($4.50) per square foot. All monthly rentals shall be payable on the first day of each month, and in the event this lease commences in the middle of the month, the first payment shall be pro-rated for that portion of the first month. * * * The rent payment for the first three months of the initial lease term shall be waived so that Lessee may construct the interior of the building for their restaurant needs. * * *

* * *

17. <u>Default.</u>

In the event Lessee shall default in the payment of the monthly rental as provided herein and failure of Lessee to cure such default within Fifteen (15) days, shall at the option of Lessor, work as a forfeiture of this lease, or Lessor may enforce performance of any manner provided by law, and Lessor's agent or attorney shall have the right without further notice or demand to re-enter and remove all persons from Lessor's property without prejudice to any remedies for arrears of rent or breach of covenant, or Lessor's agent or attorney may resume possession of the property and relet the same for the remainder of the term at the best rental such agent or attorney can obtain for the account of Lessee, who shall pay any deficiency, and Lessor shall have a lien and security for such rental upon the fixtures and equipment belonging to Lessee which are on the leased premises.  * * *

* * *

19. <u>Quiet Enjoyment.</u>

Lessee, upon paying the rent and performing the covenants and agreements of this lease, shall quietly have, hold and enjoy the leased premises and all rights granted Lessee in this lease during the term hereof and any extensions hereto, if any.  * * *

* * *

24. Complete Agreement.

This lease contains a complete expression of the agreement between the parties and there are no promises, representations or inducements except such as are herein provided.

{¶ 8} Shepler testified on cross-examination that when the lease was signed, Miller told him that he did not have to pay any rent until three months after Iron Horse opened. He claimed that Garry Miller "stated in front of witnesses I did not have to pay rent until after the first three months of opening my business doors" and that "[h]e said it right then, the day we all signed the lease in the office."

{¶ 9} Upon execution of the lease, Iron Horse began renovations on the building. Shepler testified that GGJ paid for a new roof and a new hot water heater, but Iron Horse paid for the rest, which included a new gas line to the building, revamped electrical wiring, and a remodeled kitchen and dining area. He claimed that Iron Horse spent approximately $90,000.00 on the renovations. According to Shepler, the renovations went well, but the health department kept coming up with additional things to be done in order to receive the necessary licenses to open.

{¶ 10} By October 2013, Miller approached Shepler and asked what needed to be done to get the restaurant opened. Shepler testified that although he had financing lined up, Miller volunteered to give him a $30,000.00 loan. Shepler accepted the money and signed a promissory note listing the restaurant equipment as the collateral.

5.

**{¶ 11}** Shepler testified that by December 2013, Iron Horse was just waiting on the health department. It had replaced all the flooring and had started installing booths. Shepler and Habel had worked out a menu and had visited suppliers and test-cooked most of the food. They had identified people that they wanted to hire to run the business and were ready to begin training them.

**{¶ 12}** Shortly before Christmas 2013, Shepler contacted the health department and spoke with the inspector's supervisor. Shepler testified that he was able to clarify the situation with the supervisor and was informed that the licenses were approved and could be picked up after the holidays.

**{¶ 13}** On December 30, 2013, however, several of Miller's employees began changing the locks on the doors to the restaurant. The employees' efforts set off the alarm and Shepler and the police responded to the building. The police report states that Shepler never received an eviction notice from GGJ, and he claimed that the eviction was illegal. After several phone calls were made, the employees left the premises. Shepler testified that Miller's employees attempted to change the locks several more times after that.

**{¶ 14}** Sometime in January or February 2014, GGJ posted a "Notice to Vacate the Premises" on the door of the restaurant, which stated that Iron Horse was being asked to leave for "Failure to pay rent" and "Continued occupation of premises without lease." Shepler testified that the notice was posted shortly before the restaurant was scheduled to

6.

open.  Further, Shepler stated that prior to receiving that notice, no one had asked Iron Horse to pay any rent.

{¶ 15} After GGJ attempted to change the locks and sent the notices to vacate, Iron Horse determined that it was not feasible to open the restaurant.  At the end of February 2014, Iron Horse auctioned off all of the restaurant equipment and returned the premises to GGJ.

{¶ 16} Habel, the other owner of Iron Horse, testified next.  She stated that once the lease was signed, she spent almost all of her time at the restaurant, cleaning it and getting it ready to open.  In her mind, the restaurant would have been ready to open by the end of January or the beginning of February 2014, and that it would have opened but for all of the attempts to change the locks on the doors.  Habel testified that she was present on at least three occasions where Miller's employees attempted to "break in" and change the locks.  By the end of February 2014, Habel and Shepler were exhausted and frustrated and decided to give up on opening the restaurant.

{¶ 17} GGJ called Garry Miller as its first witness.  Miller testified that when the lease was signed, he gave Iron Horse three months to do the remodeling.  When it became clear that Iron Horse was not going to be able to open on time, Miller gave it more time, which he left open-ended.  Miller estimated that Iron Horse probably needed an additional three months.

7.

{¶ 18} In October 2013, Miller approached Shepler to see how things were coming along. Miller testified that Shepler was distraught and claiming "I can't do it. I can't get it open." According to Miller, Shepler told him that he could not get a loan from the bank and did not have the money to open the restaurant. At that point, Miller offered Shepler the $30,000 loan, and Shepler volunteered the restaurant equipment as collateral.

{¶ 19} After the loan in October 2013, Miller did not speak with Shepler. But in December 2013, Miller became aware that Shepler was going to auction off all of the restaurant equipment. Miller was afraid that Shepler was going to sell all of the restaurant equipment, take the money, and walk away. He attempted to contact Shepler, but Shepler would not respond. Having not heard from Shepler, Miller put a padlock on the restaurant doors to force Shepler to speak with him. He then received a letter from Shepler's lawyer informing him that it was illegal to place the lock on the doors, so Miller had it removed the next day. Miller stated that he would not have locked Shepler out of the building if it had not been for the notice about the auction.

{¶ 20} On cross-examination, Miller was asked about the rent payments:

Q. * * * So I believe you initially testified that the lease says you gave Iron Horse three months rent free to get open; is that accurate?

* * *

A. Yes.

8.

Q. And then you testified that it wasn't open after three months and you gave them more time to get her done, I think you said?

A. Yes.

Q. And you said it was open ended and you never put a stop date on it?

A. I didn't, no.

Q. Okay. And when you say you gave them more time to, to get it done, does that mean you didn't ask for any rent?

A. No, I didn't ask for no rent.

Q. Okay. So as long as Iron Horse was working toward opening, you told him not to worry about any rent payments; is that accurate?

A. That's correct.

{¶ 21} Miller then was asked about the eviction notice. Miller admitted that the reasons listed on the notice to vacate were not correct and he clarified:

Q. So the Iron Horse had a lease at that time?

A. Yes.

Q. * * * So as of, you know, for the month of January 2014, Iron Horse wasn't late on rent?

A. No. Because they weren't paying rent.

Q. But you didn't ask them for rent?

A. I didn't ask them for rent.

Q. Because they were still working towards open?

A. Yes.

{¶ 22} Finally, Miller was asked about whether Iron Horse was in default of the lease agreement:

Q. But Iron Horse didn't owe you rent in January of 2014, did they?

A. No.

Q. Okay. So they were not in default at that time, were they?

A. No.

Q. Okay.

A. Because I didn't ask for it.

Q. Okay. And on top of that, the -- did you ever send them a notice to pay rent?

A. No.

Q. And even assuming that Iron Horse, for some reason, decided to auction their business equipment sometime between when you loaned it to them -- or when you made a loan to them and early January, that wouldn't have breached the lease, would it?

A. No.

Q. Okay. It may have breached a separate agreement with you?

A. Yes.

Q. But it wouldn't have been a breach of the lease?

A. No.

{¶ 23} Finally, GGJ called Jeffrey Herring as its last witness. Herring testified that in December 2013, he received notice from one of Miller's employees that Iron Horse was advertising an auction to sell all of its restaurant equipment.

{¶ 24} Thereafter, the parties rested and presented the trial court with their closing arguments. The court took the matter under advisement.

{¶ 25} On December 22, 2022, the trial court entered its judgment finding in favor of GGJ. After setting forth the elements of a breach of contract claim, as well as statements of the law concerning the parol evidence rule, the trial court reasoned:

> In the present case, the Lease provides, at paragraph 3, for monthly rental payments due on the first day of the month with the first three payments of the initial rental term being waived (March - May 2013). The Lease further provides at paragraph 17, that in the event of default in monthly payments by the Lessee and failure of the Lessee to cure the default within 15 days, said failure operates as a forfeiture of the lease and Lessor would have the right to re-enter the Property and remove persons and property from therein. Finally, paragraph 24 of the Lease provides, "This lease contains a complete expression [of] the agreement between the

11.

parties and there are no promises, representation or inducements except as are herein provided."

The Lease is clear and unambiguous and contains a full integration provision. As such, no oral or written modifications are permitted. Specifically, further waivers of rent payments after May 2013 are not provided for in the Lease and cannot be enforced. Since the Lease provided for payments of rent commencing June 2013 and the payments were not made, by the terms of the Lease, GGJ was permitted to consider the Lease forfeited and re-enter the premises.

## II. Assignments of Error

{¶ 26} Iron Horse has timely appealed the trial court's December 22, 2022 judgment and now asserts three assignments of error for review:

The Trial Court erred in determining that Appellee did not breach the parties' agreement and its decision was against the manifest weight of the evidence.

The Trial Court erred when it determined the parol evidence rule applied to the parties' conduct months after the execution of the contract.

The Trial Court erred when it determined that a waiver of rent could not be enforced because one was not provided for in the lease.

## III. Analysis

{¶ 27} Iron Horse's assignments of error all pertain to the interpretation and enforcement of the contract, thus they will be addressed together.

{¶ 28} "In an appeal from a civil bench trial, we generally review the trial court's judgment under a manifest-weight standard of review." *Bonner v. Delp*, 2021-Ohio-3772, 180 N.E.3d 11, ¶ 38 (6th Dist.), quoting *Mike McGarry & Sons, Inc. v. Constr. Resources One, LLC*, 2018-Ohio-528, 107 N.E.3d 91, ¶ 90 (6th Dist.). In so doing, "[w]e weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered." *Mike McGarry & Sons* at ¶ 90, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C. E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 29} But, where an appeal from a bench trial presents a questions of law, we review such legal issues de novo. *Marshall v. Snider-Blake Business Serv., Inc.*, 10th Dist. Franklin No. 21AP-700, 2022-Ohio-1869, ¶ 13, *appeal not allowed*, 167 Ohio St.3d 1526, 2022-Ohio-3322, 195 N.E.3d 162; *Mike McGarry & Sons* at ¶ 90. Accordingly,

13.

the trial court's legal conclusions will be reviewed de novo, while its factual conclusions will be reviewed under the manifest weight standard.

{¶ 30} This case involves a claim for a breach of contract. "To establish a breach of contract, the plaintiff must establish 'by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure.'" *Quest Workforce Solutions, L.L.C. v. Job1USA, Inc.*, 2016-Ohio-8380, 75 N.E.3d 1020, ¶ 40 (6th Dist.), quoting *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 77 (6th Dist.).

{¶ 31} At issue here are the concepts of modification and waiver of contract terms. Importantly, "[t]he modification of a contractual term is distinct from the waiver of a contractual term." *BR Kettering Towne Ctr. L.L.C. v. Golden City Ballroom L.L.C.*, 2d Dist. Montgomery No. 26718, 2016-Ohio-5159, ¶ 44. "A modification to a contractual provision is an agreement by the parties to change or modify the term in question." *Id.* "In contrast, waiver is 'a voluntary relinquishment of a known right.'" *Id.*, quoting *Arnett v. Bardonaro*, 2d Dist. Montgomery No. 25371, 2013-Ohio-1065, ¶ 42; *see also Glidden Co. v. Lumbermans Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, 861 N.E.2d 109, ¶ 49 ("Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional.").

14.

{¶ 32} On the issue of modification, the trial court correctly determined that the parol evidence rule prevented Iron Horse from demonstrating that the terms of the lease were orally modified at contract signing when Miller allegedly told Shepler that Iron Horse did not have to pay rent until three months after it opened.

{¶ 33} "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27, 734 N.E.2d 782 (2000), quoting 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4.

{¶ 34} Here, the terms of the written lease agreement provided only that the rent would be waived for the first three months, i.e., March, April, and May 2013. The written agreement waiving rent for those months was not conditioned on Iron Horse opening for business, and nothing in the lease stated that Iron Horse would not be required to pay rent until it opened. Even if Miller contemporaneously told Shepler that rent would not be required until three months after Iron Horse opened, the parol evidence rule precludes Iron Horse from claiming that the lease was orally modified at that time. Thus, pursuant to the written terms of the lease, Iron Horse was obligated to begin paying rent on June 1, 2013.

15.

{¶ 35} The trial court erred as a matter of law, however, when it determined that further waivers of rent by GGJ could not be enforced.  "A waiver of any of the terms of a contract may be either by subsequent contract, written or oral, or by the acts and conduct of the parties."  *Ohio Farmers Ins. Co. v. Cochran*, 104 Ohio St. 427, 135 N.E. 537 (1922), paragraph three of the syllabus; *Checkers Pub, Inc. v. Sofios v. One 49 N., L.L.C.*, 2016-Ohio-6963, 71 N.E.3d 731, ¶ 33 (6th Dist.).  Sometimes, a contract will contain a "no oral-modification clause" or an "anti-waiver" provision.  The lease in this case did not contain those terms, but even if it did "no-oral modification and written waiver provisions, like any other contractual provision, can be waived by the parties."  *3637 Green Rd. Co., Ltd. v. Specialized Component Sales Co., Inc.*, 2016-Ohio-5324, 69 N.E.3d 1083, ¶ 22 (8th Dist.); *USPG Portfolio Six, LLC v. Dick's Sporting Goods, Inc.*, 2023-Ohio-550, 209 N.E.3d 263, ¶ 67 (2d Dist.); 13 Williston on Contracts 39:36 (4th Ed.) ("The general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or failure to enforce clause in the contract."); *Am. Business Invests., Inc. v. Shaeena and Allos, LLC*, 2023-Ohio-739, 210 N.E.3d 651, ¶ 49 (Mayle, J., dissenting).  Thus, contrary to the trial court's reasoning, nothing in the lease prohibited GGJ from waiving the term requiring payment of rent.

{¶ 36} The question, then, is whether GGJ did, in fact, waive Iron Horse's obligation to pay rent.  Whether a contract term has been waived is generally a question

of fact. *Cochran* at paragraph five of the syllabus; *Eureka Multifamily Group v. Terrell*, 6th Dist. Lucas No. L-14-1152, 2015-Ohio-1861, ¶ 13. "A party asserting waiver must prove it by establishing a clear, unequivocal, decisive act by the other party, demonstrating the intent to waive." *Mike McGarry & Sons*, 2018-Ohio-528, 107 N.E.3d 91, at ¶ 103; *White Co. v. Canton Transp. Co.*, 131 Ohio St. 190, 2 N.E.2d 501 (1936), paragraph four of the syllabus.

{¶ 37} Here, Miller's testimony on cross-examination established his clear and unequivocal intent to waive the payment of rent. Miller testified that as long as Iron Horse was working towards opening it should not worry about making any rent payments, that GGJ did not request any rent payments, and that no rent payments were due in January 2014 when GGJ attempted to lock Iron Horse out of the property. Furthermore, there is no evidence in the record that would demonstrate that GGJ did not waive the payment of rent through January 2014. Thus, the trial court's finding that Iron Horse breached the lease by failing to make rent payments, thereby entitling GGJ to re-enter the premises, is against the manifest weight of the evidence.

{¶ 38} Applying this conclusion to the elements of a claim for breach of contract in this case, the evidence demonstrates that a contract existed, Iron Horse fulfilled its obligations under the contract to the extent that those obligations were not waived, and GGJ failed to fulfill its obligation under paragraph 19 of the contract that Iron Horse "shall quietly have, hold and enjoy the leased premises and all rights granted Lessee in

17.

this lease during the term hereof and any extensions hereto" when it attempted to re-enter the premises and lock out Iron Horse.

{¶ 39} The remaining issue, then, is whether and to what extent Iron Horse suffered damages from GGJ's breach of the lease agreement. The trial court did not reach this issue in its judgment and, as a reviewing court, this court declines to usurp the trial court's role by considering that issue for the first time on appeal. *Birr v. Birr*, 2012-Ohio-187, 969 N.E.2d 312, ¶ 52 (6th Dist.), citing *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 360, 604 N.E.2d 138 (1992).

{¶ 40} Because the trial court erred when it determined that GGJ could not waive the payment of rent, and because the evidence incontrovertibly demonstrates that GGJ in fact did waive the payment of rent, the trial court's judgment in favor of GGJ on Iron Horse's claim for breach of contract is against the manifest weight of the evidence. Accordingly, Iron Horse's assignments of error are well-taken.

## IV. Conclusion

{¶ 41} For the foregoing reasons, the judgment of the Ottawa County Court of Common Pleas is reversed. This matter is remanded to the trial court for consideration of the issue of damages on Iron Horse's breach of contract claim. GGJ is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed,
and remanded.

18.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.                           _____
                                                   JUDGE

Myron C. Duhart, J. _____

                                          _____

Charles E. Sulek, P.J.                           JUDGE
CONCUR.

                                          _____
                                                   JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.