[Cite as *McGarry & Sons, Inc. v. Constr. Resources One, L.L.C.*, 2018-Ohio-528.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

Mike McGarry & Sons, Inc.                    Court of Appeals No. S-17-005

      Appellant                             Trial Court No. 14 CV 926

v.

Construction Resources One, LLC, et al.      **DECISION AND JUDGMENT**

      Appellees                             Decided: February 9, 2018

* * * * *

Timothy L. McGarry and Brendan M. Mewhinney, for appellant.

Robert T. Glickman and John E. Moran, for appellees.

* * * * *

**OSOWIK, J.**

**Introduction**

{¶ 1} This case concerns a contractual dispute between a painting subcontractor, Mike McGarry & Sons, Inc., a general contractor, Construction Resources One, Inc., and the owner of the facility where the work was performed, Cuyahoga Heights Commerce One, LLC.

{¶ 2} In 2013, Construction Resources One, Inc. ("CR-One") engaged Mike McGarry & Sons, Inc. ("MMS") to clean, prime and paint part of an unoccupied manufacturing facility. The property owner, Cuyahoga Heights Commerce One, LLC. ("Cuyahoga Heights"), was negotiating with a tenant, and CR-One's job was to prepare part of the building for occupancy.

{¶ 3} The painting aspect of the project was beset by cost-overruns and delays. MMS alleges that Cr-One breached an agreement to pay it for those extra costs. When CR-One did not pay, MMS filed a mechanic's lien against the property owner, asserting more than twice the value of the original contract.

{¶ 4} On October 24, 2014, MMS filed a four count complaint in the Sandusky County Court of Common Pleas against CR-One and Cuyahoga Heights (referred jointly as "appellees") for breach of contract, violation of Ohio's Prompt Payment Act, unjust enrichment, and foreclosure of a mechanic's lien. Cuyahoga Heights counterclaimed, asserting fraud and tortious interference with business relations based upon the filing of the lien.

{¶ 5} Acting on the parties' cross motions for summary judgment, the trial court dismissed all of MMS' claims, except the breach of contract claim. After a bench trial, the trial court found that MMS failed to show that appellees breached an agreement to compensate it for any amount over the original contract. The court found in favor of Cuyahoga Heights as to both of its counterclaims. The court also sanctioned MMS for maintaining the mechanic's lien and for unnecessary motion practice. MMS appealed.

2.

{¶ 6} The facts giving rise to the claims asserted in this case, unless noted, are not disputed and are set forth below.

**Facts and Procedural History**

{¶ 7} Cuyahoga Heights owns commercial properties throughout northern Ohio, including property located at 4600 Oak Harbor Road, in Fremont, Ohio. In 2013, it hired CR-One to act as general contractor and to prepare the vacant facility for occupancy. At the time, Cuyahoga Heights was negotiating with "Unican" to lease the facility. Among other items, Unican manufactures paint cans. It was to occupy part of the property and operate a single manufacturing line, with the hope that it would add lines, and with them, the need for more space in the future. Accordingly, Cuyahoga Heights hired CR-One to refurbish the facility in four phases. Phases two, three and four would be added when and if the need arose.

{¶ 8} CR-One's President, Matt Ambrose ("Ambrose"), invited MMS to submit a quote to clean, prime, and paint the walls and ceiling of phase I, which consisted of 105,717 square feet.

{¶ 9} Cuyahoga Heights and CR-One share common owners. Real estate developers Christopher Semarjian and Stuart Lichter are the majority owners of Cuyahoga Heights and the co-owners of CR-One. Semarjian testified that CR-One is Cuyahoga Heights' exclusive general contractor, although CR-One occasionally performs contracting service for other clients.

{¶ 10} MMS is in the commercial painting business. Sean McGarry ("Sean") is MMS' estimator and project manager. Sean has been in the painting industry for 26

3.

years and has estimated thousands of projects. In preparation for quoting this job, Sean was given complete access to the property. After visiting the property, Sean provided CR-One with a quote of $118,340, which amounted to $1.12 per square foot. Sean estimated that the project would require six weeks, three to prime and clean and three weeks to paint. The evidence shows that CR-One had no input on the methods or products used by MMS.

{¶ 11} On February 13, 2013, prior to executing a written contract, MMS set up at the property. As it did so, MMS asked CR-One for access to water so that it could power wash the surfaces, to turn off the electricity, and to increase the temperature to at least 50 degrees so that paint could adhere.

{¶ 12} CR-One delivered heaters to the property and hung tarps to enclose phase I so as to prevent heat from escaping. The temperature improved when the heaters were delivered. MMS did not raise any concerns about temperature after the delivery of the heaters. At MMS' request, CR-One also delivered water trucks to allow MMS to power wash. To maintain safety while power washing, Ambrose proposed that CR-One would shut off the electricity in segments (so MMS would have access to lighting and power), and he asked MMS to cover the electrical bus ducts to avoid electrocution. MMS did not object to this proposal or state that it would result in extra cost.

{¶ 13} Despite asking for access for water, MMS decided to "blow down" the surfaces of the property, rather than to power wash. This change was not done at CR-One's request. On February 28, 2013, after MMS had decided to change its cleaning

4.

method, Ambrose asked Sean for a breakdown of the costs for the project, including the "blow down." On March 6, 2013, Sean responded that the cost would remain $118,340.

{¶ 14} MMS' paint supplier on the project was Glidden. On February 20, 2013, Glidden agent, Brian Conroy, recommended that MMS should prime "**all surface** areas (100%)" with a primer called "Devguard 436." At trial, Sean testified that he viewed the recommendation to prime the entire project as "overkill."

{¶ 15} MMS began working on the property on or about February 21, 2013, still without a contract.

{¶ 16} On March 7, 2013, MMS, through its president, Brendan McGarry, signed a "SUBCONTRACT AGREEMENT BETWEEN GENERAL CONTRACTOR AND SUBCONTRACTOR." Before sending it to Ambrose for CR-One's signature, Brendan unilaterally made some handwritten changes to a few provisions, but he left undisturbed the originally quoted price, notwithstanding that, by then, (1) MMS had decided to change its cleaning methods and (2) it was aware of its paint supplier's recommendation that MMS prime the whole structure, not just to "spot prime." The quoted price included "spot priming," which means only priming certain areas, not the entire structure. Sean reviewed the contract and advised Brendan that it was acceptable.

{¶ 17} Paragraph 2 of the contract provides, "[f]or performing the scope of work, The Subcontractor will be paid in monthly payments, based on completion percentages, the following not-to-exceed amount: $118,340.00." The term "scope of work" is used throughout the contract, but is not defined. CR-One's president, Ambrose, told Sean that he wanted phase I properly cleaned, primed, and painted to an industry standard. Sean

5.

testified that MMS's promise to CR-One was more than just that MMS "would clean and paint," but instead that phase I would be cleaned, primed, and painted "appropriately" so that "[t]he paint would stay on the wall" and the "paint would stay on the ceiling," or else MMS would fix the problems at MMS's cost.

{¶ 18} On or about March 15, 2013, CR-One asked MMS to vacate the property and to stop working, due to Cuyahoga Heights' uncertainty over lease negotiations with Unican.

{¶ 19} On March 25, 2013, during the shutdown, Sean sent Ambrose an email (the "March 2013 Email"). In it, Sean stated that he had "anticipated maybe 20-30% of the [old] paint would come off but it is more like 70-80%." Sean then relayed MMS' decision to prime "the entire structure to prevent further rusting." The email then lists four costs after the word "Add": $55,000 for primer; $23,400 for labor; $4,000 for overtime; and $3,000 for equipment rental delays, for a total of $85,400.

{¶ 20} Paragraph 13 of the contract provides for a process whereby "change orders" can be added to the contract.[1] Sean testified that the March 2013 email, quoted above, amounts to a change order request because he used the word "Add" at the bottom of it. Ambrose testified that neither party ever discussed the change order provision and that MMS never requested a change order for changed specifications.

---

[1] This change order process is discussed in detail in MMS' fourth and fifth assignments of error.

6.

**{¶ 21}** On April 2, 2013, Sean added a chain to the March 2013 email asking, "let me know if you [h]ave had a chance to review our costs due to changing the Spec and Overtime and Rental delays."

**{¶ 22}** On CR-One's behalf, Ambrose signed the contract on April 5, 2013 and returned it to Sean. He left undisturbed those handwritten changes made by Brandon, except to initialize them. Ambrose did not address Sean's recent email regarding the increased costs. Likewise, upon receipt of the fully executed contact, Sean did not object to its price or terms.

**{¶ 23}** On or about May 15, 2013, MMS returned to the property to resume working. Ambrose told Sean that he would discuss "with ownership" MMS' delay costs caused by the shutdown.

**{¶ 24}** When MMS returned to the property, there were "obvious defects," according to the trial court's findings of fact. MMS did not dispute this during trial, and the email correspondence bear this out. Specifically, there were spots of rust "bleeding through" newly painted surfaces and new paint was peeling and chipping off the surface. Ambrose testified that falling paint chips posed safety and quality control problems for its tenant. Ambrose and Sean had many conversations about MMS's defective work, and MMS never objected or claimed that its work was not defective.

**{¶ 25}** In compliance with Paragraph 15, CR-One advised MMS in writing that its defective work was jeopardizing completion of the project. CR-One did not, however,

7.

instruct MMS how to fix the defective work.[2] According to Sean, the defects in MMS's work were covered under MMS's warranty.

{¶ 26} On May 16, 2013, upon resuming the project, Sean re-sent the March 2013 email to Ambrose. He wrote, "I should be able to get there * * * [t]o work on a fix for the bleed through. We need to work out the extras for [t]he delay and changing the specifications. Maybe we could do this on a Cost plus basis. I sent you this estimate back in March."

{¶ 27} That same day, Ambrose responded,

Sean; As you are aware, we are at a critical time on this project in which we need to be out of the way for the tenant to set up his assembly line and we need your resolution on deficient work in order to be clear for him. I will have a check for you either today or tomorrow as discussed, yet ownership here along with the tenant is eyeing your performance to fix the here and now and then finish the project. *I will absolutely discuss the extras you had presented to me and I assure you we will both be happy in the end, yet I cannot discuss that until we are on course for the here and now*. (Emphasis added.)

---

[2] Paragraph 15 states that, if the Subcontractor is failing to deliver its scope of work, the General Contractor reserves the right to complete the Subcontractor's work by whatever method the General Contractor deems necessary. Reasonable expenses incurred to complete the remaining portion of the work were to be charged against the subcontractor.

8.

{¶ 28} Ambrose explained at trial that he told Sean that MMS could have "the opportunity to bid competitively on future projects including those in the building." He added that this future business would make MMS "happy," because MMS could recover cost overages through profits on future jobs if those jobs were run more efficiently. It is undisputed that CR-One never agreed to pay for any additional amounts for "changed specifications."

{¶ 29} Sean testified that it was his "understanding" that MMS would get a change order for the delay, and that MMS would be hired on the other phases of the project. Sean testified that Ambrose agreed to "help me out as much as he could right now and then, and then fully help me out, you know, when we did the work on the rest of the building." Brendan also interpreted Ambrose's email as a guarantee that CR-One would pay "something above MMS' costs."

{¶ 30} As it corrected the problems, MMS decided to use a different primer, but it never discussed that primer with CR-One. The record also indicates that MMS power washed some, if not all, of phase I.

{¶ 31} On June 13, 2013, Sean wrote to Ambrose that MMS' costs "may be over $200,000."

{¶ 32} On or about July 9, 2013, MMS sent CR-One a quote to clean, prime, and paint phases 2, 3, and 4, totaling $538,710, or $2.13 per square foot. Ambrose responded that, "I cannot turn the remaining work loose without getting out of the first phase. Got to out – done/ done by August 19. I will write a check to you the beginning of next week, please step this up." To that, Sean responded, by email dated July 25, 2013, "I am glad

9.

that [my rest-of-building quote] works for you in your budget." Ambrose testified at trial that he did not know what Sean meant because and he had not yet developed a budget for the other phases and he had not indicated that Sean's quote was or would be accepted.

{¶ 33} On September 4, 2013, Sean provided a timeline for finishing the project. He included a request to "collect the remainder of the [contract price of] $118,000 and the delay."

{¶ 34} During the course of the project, MMS' controller, Linda Vasquez, sent two payment applications to CR-One. The first one, on March 31, 2013, requested $94,500 and the second one, on October 31, 2013, sought $12,006. Both payment applications were signed under oath by Vasquez, do not reference any extra work, and state that there were no change orders. The applications contains a field for "Net Change by Change Orders." They also contain a grid entitled "Change Order Summary," in which the preparer can insert amounts for change orders. In each designated area in which change orders could be reflected, Vasquez inserted zero ("0") dollars. Vasquez testified that she did not include a request for additional monies for any additional work or charges because she knew that CR-One would have rejected the payment application if she had done so.

{¶ 35} Lien waivers accompanied both payment applications. A lien waiver is an acknowledgement by the party seeking payment that it will not file a lien against the property for the amount of the compensation received. The two payment applications total $106,506. Thus, as of October 31, 2013, the full contract price had been billed by MMS, less 10%. The ten percent that was not billed represents "retainage." Retainage is

10.

money taken out of each invoice, to be paid by the general contractor at the conclusion of the project. The retainage in this case was $11,834. As of the trial date in this case, MMS had not submitted a payment application or invoice for the retainage amount, despite Ambrose's request that it do so. In its decision, the trial court ordered CR-One to pay MMS that amount, and CR-One does not dispute that it is owed.

{¶ 36} On October 3, 2013, Sean sent Ambrose an email requesting $37,000 in "delay costs" that MMS alleged it incurred as a result of the two month delay. Ambrose testified that he was expecting a $5,000 to $7,000 cost for the delay. As he said he would, Ambrose discussed MMS's delay claim with CR-One's co-owner, Christopher Semarjian ("Semarjian"). The trial court found that, "Semarjian, with Ambrose's recommendation, rejected the request." On December 30, 2013, Ambrose communicated the denial of the delay claim to Sean via email. Ambrose explained, "[l]ooks like delay claim will not be entertained. There was quite a bit of damage * * * due to pressure washing that was done. This ended up costing us more money to repair and along with everything else put us over the budget significantly." Sean did not object or otherwise complain that CR-One denied its delay claim. In its decision, the trial court ordered CR-One to pay MMS $7,000 in compensation for the delay, in addition to the retainage amount. In all, the court ordered CR-One to pay MMS $18,834. CR-One did not appeal the judgment or otherwise object.

{¶ 37} On November 6, 2013, MMS submitted a quote for Phase II of the project in the amount of $382,610.00, or $5.20 per square foot. Ambrose responded to the quote with questions. He also pointed out that areas in phase 1 still suffered from "bleed

11.

through." To that specific issue, Sean responded, "[i]f you want me to touch up in Phase 1 let me know if I can coordinate with Gary. Let me know if you would like me to proceed." At trial, Sean testified that he did not remember whether Ambrose ever called him in response to this email. Ambrose testified that he never spoke to Sean about it and he did not authorize MMS to come back to the property.

{¶ 38} Sean contacted Gary Paxson, a Unican representative, to arrange for access to the property. MMS then sent painter Duane Blake there to perform "touch up" work. Blake's last day at the property was November 22, 2013. The trial court found that "CR-One was without any knowledge of this work and did not order it."

{¶ 39} On January 31, 2014, Vasquez executed a mechanic's lien in the amount of $269,960.00 in favor of MMS against the property, which it recorded with the Sandusky County Recorder, and sent to CR-One. Upon receipt, Ambrose contacted MMS and demanded that it be withdrawn. Ambrose sent two writings to MMS, each one claiming that the lien was filed in error or fraudulent and must be removed. MMS refused to release the lien.

{¶ 40} Cuyahoga Heights learned of the mechanic's lien in November of 2014. At that time, it was in the process of financing the property with lender FC Bank. Its request for a loan had been approved, and it had received a "term sheet" from the bank. Once the lien was discovered, however, processing of the loan "ground everything to a halt." To maintain its financing arrangement with the bank, Cuyahoga Heights took out a bond on the property with SureTec, a bonding company. Cuyahoga Heights had to make a deposit of $405,000 into an escrow account and pay $8,100 in premiums. The deposit that was

12.

placed in an escrow account was unavailable for use throughout the 456 days that the lien was in place.[3] Cuyahoga Height proffered evidence that it suffered $63,570 in damages based upon the loss of use of those funds plus the premiums. MMS did not challenge the calculation method or damages amount.

{¶ 41} On October 24, 2014, MMS filed a four count complaint in the Sandusky County Court of Common Pleas against appellees for breach of contract, violation of Ohio's Prompt Payment Act, unjust enrichment, and foreclosure of the mechanic's lien. Cuyahoga Heights counterclaimed, asserting fraud and tortious interference with business relations based upon the filing of the lien. On December 21, 2015, MMS moved for leave to file an amended complaint. It sought to add claims of fraud and breach of a duty to act in good faith against the appellees. The trial court denied MMS leave to amend.

{¶ 42} The appellees filed for summary judgment as to counts 1, 2, and 3, and, Cuyahoga Heights filed a separate motion for summary judgment as to the alleged invalid mechanic's lien. MMS also filed for summary judgment as to Cuyahoga Heights' counterclaims. By judgment dated April 29, 2016, the trial court granted, in part, the appellees' motions, dismissing all claims asserted against them, except for MMS' breach of contract claim (Count 1). The trial court denied, in toto, MMS' cross motion for summary judgment.

{¶ 43} Following a two day bench trial, the lower court issued findings of fact and conclusions of law. In its December 29, 2016 decision, the court ruled against MMS as

---

[3] The lien was discharged by the trial court in its grant of summary judgment in Cuyahoga Heights' favor.

13.

to the breach of contract claim, based upon its finding that MMS failed to show that appellees breached an agreement to compensate it for any amount over the original contract. It ruled in favor of Cuyahoga Heights as to both counterclaims, and it awarded $63,570 in damages. It also sanctioned MMS for "persistent maintenance of claims premised on a late-filed Mechanic's Lien" and for unnecessary motion practice.

{¶ 44} At issue in this appeal are rulings by the trial court as to three pretrial motions: the denial of MMS' motion for leave to amend its complaint, the denial of MMS' motion for summary judgment as to Cuyahoga Heights' counterclaims, and the grant of Cuyahoga Height's motion for summary judgment as to MMS' claim to foreclose on the mechanic's lien. The remaining issues on appeal involve the trial court's findings of fact and conclusion of law, following the bench trial.

### MMS' Assignments of Error

1. Whether the trial court erred by denying Plaintiff's Motion to Amend Complaint.

2. Whether the trial court erred by granting Defendants' Motion for Summary Judgment in part when numerous issues of material fact existed.

3. Whether the trial court erred by failing to grant Plaintiff's Motion for Summary Judgment as to Defendants' Counterclaim.

4. Whether the trial court erred at trial by failing to construe the parties' written contract pursuant to its terms.

14.

5. Whether the trial court's finding that Defendants Did Not Waive the Change Order Provision is Against the Manifest Weight of the Evidence.

6. Whether the trial court erred at trial by ruling in favor of Defendants' Counterclaim.

7. Whether the trial court erred by finding Plaintiff's conduct was frivolous.

## MMS' motion to amend its complaint

{¶ 45} In its first assignment of error, MMS argues that the trial court erred by denying its motion for leave to amend its complaint. MMS requested leave to add claims of fraud and breach of a duty to act in good faith against appellees. The trial court denied the motion on the basis that it was untimely, prejudicial - because it would require the reopening of discovery - and "pointless" because MMS' claims failed as a matter of law. On appeal, MMS assigns error only as it relates to its fraud claim. It argues that it expeditiously moved for leave once it learned of its potential claim and that it sufficiently pled operative facts of fraud.

{¶ 46} Before a responsive pleading is served, a plaintiff may file an amendment to the complaint without leave of court. Thereafter, Civ.R. 15(A) directs a court to grant leave to amend freely "when justice so requires." The decision whether to allow a party leave to amend a complaint lies exclusively within the discretion of the trial court, and the ruling will not be disturbed on appeal by a reviewing court absent an affirmative showing of an abuse of discretion. *Wilmington Steel Prod., Inc. v. Cleveland Elec. Illum.*

*Co.,* 60 Ohio St.3d 120, 122, 573 N.E.2d 622 (1991); *Morrow v. Reminger & Reminger Co. LPA,* 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 52 (10th Dist.). "This court has held that denial of a motion for leave to amend a pleading may be based upon a showing of bad faith, undue delay or undue prejudice to the opposing party." *Leo v. Burge Wrecking, LLC,* 6th Dist. Lucas No. L-16-1163, 2017-Ohio-2690, ¶ 16, quoting *Sun Fed. Credit Union v. Yeager*, 6th Dist. Fulton No. F-12-015, 2013-Ohio-2810, ¶ 12.

{¶ 47} MMS filed suit on October 24, 2014. Fourteen months later, on December 18, 2015, MMS filed for leave to amend and attached to its motion the proposed amended complaint. In it, MMS made the following allegations:

CR-One "failed to disclose, when it had a duty to do so, that [CR-One] was not an independent general contractor, but was a sister company to the owner of the Property, Cuyahoga One."

Appellees "made numerous misrepresentations to MMS, through [Ambrose], including that [Cuyahoga Heights] would consider MMS's extra costs and that MMS would be able to recoup its extra costs in later phases of the construction project."

CR-One failed to disclose that Ambrose's bonus "was based upon meeting budgets" for the owners, "thus making it less likely that [he] would receive a bonus if Cuyahoga Heights paid MMS' extra costs"; and

Based upon those assurances, MMS continued to perform work over and above what it was contractually required to perform.

16.

**{¶ 48}** Pursuant to Civ.R. 9(B), whenever fraud is alleged in a complaint, the circumstances constituting such fraud "shall be stated with particularity." Those circumstances include: "the time, place and content of the false representation; the fact misrepresented; the identification of the individual giving the false representation; and the nature of what was obtained or given as a consequence of the fraud." *Woods v. Caterpillar, Inc.*, 6th Dist. Lucas No. L-04-1176, 2005-Ohio-4170, ¶ 11, quoting *Aluminum Line Prods. Co. v. Bard Smith Roofing Co., Inc.,* 109 Ohio App.3d 246, 259, 671 N.E.2d 1343 (8th Dist.1996). Where a fraud complaint fails to set forth facts with sufficient particularity, a trial court does not err in dismissing it. *Woods* at ¶ 30.

**{¶ 49}** MMS failed to assert anything other than the thinnest of allegations. That is, there are no details set forth its proposed claim, or in the proposed complaint as a whole, regarding the time, the place and/or the precise content of appellees' alleged "numerous misrepresentations." *Woods* at ¶ 11. We agree with the trial court that MMS did not sufficiently allege a claim a fraud, as a matter of law.

**{¶ 50}** Even the allegation of fraud described by MMS *in its appellate brief* fails to allege operable facts of fraud. There, MMS described the fraudulent statement as follows:

> Ambrose promised Sean McGarry he would "absolutely discuss the extras [with ownership] you had presented to me and I assure you we will both be happy in the end [of the project]" and that Defendants would "take care" of MMS by the end of the project.

17.

{¶ 51} MMS alleged, at most, a future promise by Ambrose, i.e. that CR-One "would take care of" MMS. To support a claim of fraud, a misrepresentation must be a fact, rather than a promise. *Cuspide Props. v. Earl Mech. Servs.,* 6th Dist. Lucas No. L-14-1253, 2015-Ohio-5019, ¶ 56. "Fraud is generally predicated on a misrepresentation relating to a past or existing fact, and not on promises or representations relating to future actions or conduct." *Id.*, quoting *Krukrubo v. Fifth Third Bank*, 10th Dist. Franklin No. 09AP-933, 2010-Ohio-1691, ¶ 9. An exception to this rule exists, however, where an individual makes a promise concerning a future action, occurrence, or conduct, and at the time of the promise, the individual has no intention of keeping the promise. *Id.*, quoting *Williams v. Edwards*, 129 Ohio App.3d 116, 124, 717 N.E.2d 368 (1st Dist.1989). The fact that the promise was later unfulfilled is not enough to meet the burden of proving a misrepresentation in this manner. *Id.,* citing *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d 313, 328, 666 N.E.2d 235 (6th Dist.1995). MMS failed to allege, much less to demonstrate, anything other than a vague promise by CR-One to pay MMS an undefined amount, at some unknown time in the future. Moreover, there are no facts to suggest that Ambrose, when he made the "promise," had no intention of keeping it. Because MMS, as the movant, failed to present operative facts in support of its new allegations, the trial court did not abuse its discretion in denying the motion to amend. *Solowitch v. Bennett,* 8 Ohio App.3d 115, 117, 456 N.E.2d 562 (8th Dist.1982).

{¶ 52} Not only is MMS' fraud claim legally insufficient, but it is also premised upon an allegation of fact that is contradicted by the record. In its proposed fraud claim, MMS alleged that Ambrose promised to present its claim for extra costs and its delay

18.

claim to "ownership." In reality, MMS claims that Ambrose unilaterally denied those claims. The only evidence on this point was offered by (1) Ambrose who testified during his deposition that "the ownership, Chris Semarjian" decided that MMS' delay claim would not be considered; and (2) Semarjian who testified during his depositon that Ambrose came to him to discuss the fact that MMS was seeking "extra compensation for work performed in [p]hase 1." Semarjian asked whether the claim was "valid" and whether "we had changed any scope." Ambrose answered "no" to both, and Semarjian "moved on because I didn't think it was realistic." Thus, the record on this point, at the time MMS moved for leave, was that Ambrose was *not* the decision-maker with regard to MMS' delay claim and/or claim for extra costs. We find that MMS' proposed fraud claim is both legally and factually flawed.

{¶ 53} Finally, to the extent that MMS cites the timing of Semarjian's December 7, 2015 deposition to justify waiting until December 18, 2015 to request leave, that reliance is misplaced. Throughout the legal memoranda filed in this case, MMS laments that it did not know that, while it was negotiating the contract and then performing services under the contract, CR-One and Cuyahoga Heights shared common owners, namely Chris Semarjian and Stuart Lichter. MMS inconsistently argues on the one hand, that this common ownership precluded CR-One from being "independent" from Cuyahoga Heights and, on the other, that Ambrose, as the president of CR-One, unilaterally determined that MMS would not be compensated for its extra costs. Either way, MMS acknowledges that "[a]t the time the promise [to pay its claim] was made [by Ambrose], MMS reasonably relied upon the promise because it did not know the

19.

Property's owner and the general contractor were one and the same." MMS learned of the co-ownership of the businesses back on September 15, 2015, when it deposed Ambrose. Thus, to the extent that MMS' lack of knowledge of that fact led it to "rely to its detriment that CR-1 was an independent general contractor," MMS learned otherwise in September. It offers no basis for waiting an additional three months before seeking leave. "Where a motion for leave to file an amended complaint is not timely tendered and there is no apparent reason to justify the delay, a trial court does not abuse its discretion in denying the amendment." *Leo,* 6th Dist. Lucas No. L-16-1163, 2017-Ohio-2690, ¶ 10 citing *Vitek v. Wilcox*, 6th Dist. Williams No. WM89-000004, 1990 Ohio App. LEXIS 4897, *21 (Nov. 9, 1990).

**{¶ 54}** MMS moved to amend its complaint fourteen months after it filed its action, after the close of discovery, and three months after it learned about its potential claim(s). Due to MMS' failure to seek leave on a timely basis and its failure to allege legally sufficient facts, supported by the record, we cannot find an abuse of discretion by the trial court in denying MMS' motion for leave to amend its complaint. We find MMS' first assignment of error is not well-taken.

**MMS' Mechanic's Lien and Cuyahoga Height's Counterclaims**

**{¶ 55}** MMS' second and third assignments of error concern the trial court's ruling on the parties' cross-motions for summary judgment. In its second assignment of error, MMS argues that the trial court erred in granting Cuyahoga Height's motion for summary judgment as to MMS' foreclosure of its mechanic's lien claim. It asserts that there was an issue of fact regarding whether the mechanic's lien was valid, which precluded

20.

dismissal of its claim at the summary judgment phase.[4] Conversely, in its third assignment of error, MMS argues that the trial court should have granted summary judgment in its favor as to Cuyahoga Heights' counterclaims. As set forth below, we agree with MMS in both instances.

{¶ 56} Appellate review of a summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We employ the same standard as the trial court, without deference to it. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). A motion for summary judgment may be granted only when it is demonstrated (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 57} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). When a properly supported motion for summary

---

[4] In its second assignment of error, MMS complains that the trial court erred in granting the "defendants' motions for summary judgment." Its argument, however, is limited to the trial court's decision as to the foreclosure claim only. That is, MMS does *not* challenge the trial court's dismissal of counts 2 (Prompt Pay Act) or 3 (unjust enrichment) of its complaint. We leave undisturbed the trial court's judgment as to those claims.

21.

judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reviewing a ruling on summary judgment, an appellate court restricts its consideration to the same evidentiary materials that were properly before the trial court at the time it ruled on the summary judgment motion. *Guernsey Bank v. Milano Sports Enter*s., LLC, 177 Ohio App.3d 314, 2008-Ohio-2420, 894 N.E.2d 715, ¶ 30 (10th Dist.).

**{¶ 58}** The mechanics' lien statutes are remedial in nature and "designed to protect the * * * contractor whose work, goods, and skill create the structures to which the lien in part attaches." *Wayne Bldg. & Loan Co. v. Yarborough*, 11 Ohio St.2d 195, 217, 228 N.E.2d 841 (1967). Ohio's mechanics' lien statutes create rights in derogation of the common law, and are generally strictly construed as to the question of whether a lien attaches. *Fifth Third Bank v. Ohio Farmers Ins. Co*., 5th Dist. Stark No. 2010CA00286, 2011-Ohio-1774, ¶ 34, citing *Crock Constr. Co. v. Stanley Miller Constr. Co*., 66 Ohio St.3d 588, 592, 613 N.E.2d 1027 (1993), quoting *Robert V. Clapp Co. v. Fox*, 124 Ohio St. 331, 178 N.E. 586 (1931), paragraph one of the syllabus.

**{¶ 59}** Under Ohio law, a contractor must file a mechanic's lien affidavit "within seventy-five days from the date on which the last of the labor or work was performed or

22.

material was furnished by the person claiming the lien." R.C. 1311.06(B)(3). Liens filed more than 75 days after the completion of work will be deemed invalid. *See e.g. J. & F. Harig Co. v. Fountain Square Bldg.*, 46 Ohio App. 157, 187 N.E. 872 (1933) (Construing residential construction lien deadline of sixty days under Section (B)(1)).

{¶ 60} In Count 4, MMS asserted that it filed a lien against the property on February 5, 2014, attached a copy of the "affidavit for mechanics' lien" to the complaint, and requested an order foreclosing upon the lien due to appellees' alleged "default." In that affidavit, MMS' controller, Linda Vasquez, asserted that MMS last performed labor and/or furnished materials under the contract with CR-One on November 22, 2013. MMS claimed a lien in the amount of $269,960.00 against the property, owned by Cuyahoga Heights Commerce One, LLC. MMS recorded the lien affidavit with the Sandusky County Recorder on February 5, 2014. On these facts alone, MMS appears to have perfected its mechanic's lien, based upon a prima facie showing of compliance with R.C. 1311.06. *National City Bank v. Golden Acre Turkeys,* 3d Dist. Seneca No. 13-91-20, 1992 Ohio App. LEXIS 3786, *2 (Jul 17, 1992).

{¶ 61} In its motion for summary judgment, Cuyahoga Heights argued that MMS last performed work, for purposes of establishing the deadline to file a lien, on October 31, 2013 (at the very latest). It premised its argument on MMS' second application for payment, signed by Vasquez on October 31, 2013, in which she represented that 100% of the work, excluding retainage, had been completed. Assuming the accuracy of that date, the lien would have been due no later than January 14, 2014. Cuyahoga Heights argued

23.

that the lien filing date of February 5, 2014 was late and rendered it invalid, as a matter of law.

**{¶ 62}** MMS countered that the payment application established that the work was *not* fully completed by that date, specifically an amount reflecting 10% of the contract price. MMS argued that the project was not completed until November 22, 2013 when its painter, Duane Blake, finished doing touch up work and correcting bleed through issues at the property. Using that date, MMS' lien filing 75 days later, on February 5, 2014, was timely.

**{¶ 63}** The summary judgment evidence on this point established that Ambrose sent an email to Sean McGarry on November 6, 2013, with several agenda items, including to complain that "a number of areas in phase 1 are [still] bleeding through." The next day, Sean responded, "If you want me to touch up in Phase 1 let Me know if I can coordinate with Gary. Let me know if you would like me to proceed." [sic] Ambrose responded generally but not as to that issue. MMS, then, contacted the tenant of the building and arranged for MMS painter Duane Blake to return to the job site to paint over the rusted areas. The parties disagree as to the legal significance, if any, of that visit by Blake.

**{¶ 64}** In its judgment entry granting Cuyahoga Height's motion for summary judgment, the court found,

> [T]here is no question that [MMS] did re-enter the warehouse
> premises and attempt 'to extend our lien rights' which [Sean McGarry]
> indicated were to expire on 11/21/13. When paired with the deposition

24.

testimony of Belinda Vasquez, * * * there is no genuine issue of fact that the lien filed on February 5, 2014 was untimely. Thus, [MMS'] prayer to foreclose on the mechanic's lien is dismissed.

{¶ 65} Without referring to it by name, the trial court quoted from an internal email from Sean to brother, Brandan McGarry, the president of MMS. In that email, Sean wrote that, "our lien rights expire next Thurs 11-21-13. * * * I also spoke to Gary the plant manager about touching up area [sic] that have rust bleed through (I'm trying to touch up before 11-21-13 to extend our lien rights) * * *." The trial court concluded that the email, paired with the payment application, established that the lien was untimely.

{¶ 66} In support of the trial court's decision, Cuyahoga Heights argues that Blake's visit was "surreptitious" and "unauthorized" and "corrective," and amounted to nothing more than "minor touch up painting work." It cites a string of cases for the proposition that unnecessary and unsolicited tinkering and repair do not extend the last day of performance for purposes of establishing the lien filing deadlines. *See e.g. Walter v. Brothers,* 42 Ohio App. 15, 181 N.E. 554 (5th Dist.1932); *Bohunek v. Smith,* 36 Ohio App. 146, 172 N.E. 852 (8th Dist.1930). "The true test is whether the alleged repairs are a necessary part of the proper completion and performance of the work which the lien claimant undertook to do." *Walter* at 18. Cuyahoga Heights also cites Sean's email as evidence of MMS' lack of good faith and asserts that MMS' "lack of good faith is crucial to determining whether the November 2013 work extended the lien deadline."

{¶ 67} MMS counters that there was a question of fact as to whether Ambrose's email to Sean was a request for additional work, and whether MMS' work at the property

in November of 2013 was "unnecessary and unsolicited tinkering."  It also claims that the trial court construed Sean's email to his brother against MMS, in contravention of Civ.R. 56(C) which provides that the party against whom summary judgment is made is "entitled to have the evidence * * * construed most strongly in the party's favor."

{¶ 68} We agree with MMS.  Whether the materials furnished and work performed were necessary to properly complete the work in good faith and perform the contract, or merely an effort to extend the time for filing an affidavit for a lien *"is always a question of fact*."  (Emphasis added.)  *Gilson v. Windows & Doors Showcase, LLC*, 6th Dist. Fulton No. F-05-017, F-05-024, 2006-Ohio-2921, ¶ 20*,* quoting *Walter,* at 18, and *Seybold v. Pitz*, 101 Ohio App. 316, 136 N.E.2d 666 (10th Dist.1955).  In *Gilson,* a subcontractor at a residential construction project delivered screens to the job site over six months after delivering the windows and doors.  It argued that it did not hold back the screens in the hope that it would later be able to collect from the homeowners by recording a lien.  We found that whether the delivery "was done solely to extend the deadline for recording a lien" was "[c]learly * * * a question of fact."  *Gilson* at ¶ 20. Likewise, whether a party acts in good faith is a question generally left to the trier of fact. *Id.,* citing *Straus v. Doe,* 11th Dist. Lake No. 2003-L-082, 2004-Ohio-5316.  *See also Helton v. United States Restoration & Remodeling,* Franklin County Court of Common Pleas No. 11CVH-10-12874, *32-33 (Jul. 19, 2013) (Issue of fact exists with respect to whether lien was timely filed where property owners and contractor disagreed over whether the last day contractor performed services at the property or day that roofing supplies were dropped off constituted the last day work performed.).

26.

{¶ 69} Here, whether the work performed by Blake was gratuitous and/or necessary under the contract and/or whether MMS acted in good faith in sending him to the property were unresolved issues of fact, at the time Cuyahoga Heights filed for summary judgment. These facts were material to determining whether the lien was timely, and MMS, as the non-movant, was entitled to have those facts construed in its favor. We find that the trial court erred when it resolved those material facts against MMS and when it dismissed Count 4 via summary judgment. Therefore, we find MMS' second assignment of error well-taken. As set forth below, however, because the lien affidavit formed the basis for Cuyahoga Height's counterclaims, the validity of the lien was, in fact, fully litigated at trial. MMS was given the opportunity, and did, put forth evidence demonstrating that it had a good faith basis to assert in its lien affidavit that its last day of work was November 22, 2013. However, the trial court resolved that issue against MMS. It specifically found, in the context of resolving the fraud claim, that "MMS pretextually arranged with the tenant at the Property to perform this work in order to inappropriately extend its lien rights" and "MMS falsely represented the last day of work." As an appellate court, we are not fact finders. We do not weigh the evidence or judge the credibility of evidence. "Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment." *Thompson Thrift Constr. v Lynn,* 5th Dist. Delaware No. 16CAE100044, 2017-Ohio-1530, ¶93. We find that there is competent and credible evidence to support the trial court's determination that MMS' work at the property in November of 2013 was done without CR-One's knowledge or consent and undertaken for the purpose of

extending the lien deadline. Therefore, we sustain the trial court's conclusion that the lien was invalid. Accordingly, we find that the trial court's dismissal of MMS' foreclosure claim via summary judgment, while erroneous, was harmless error.

{¶ 70} This brings us to MMS' third and sixth assignments of error. Both concern Cuyahoga Heights' counterclaims for fraud and tortious interference with a business relationship. MMS argues that the trial court improperly denied its motion for summary judgment (third assignment of error) and, following the bench trial, improperly found in favor of Cuyahoga Heights as to those claims (sixth assignment of error). We agree with MMS that the trial court improperly denied its motion for summary judgment as to those claims. Accordingly, we sustain its third assignment of error, rendering moot its sixth assignment of error.

{¶ 71} In its counterclaim, Cuyahoga Heights argued that the last day that MMS worked at the property was September 25, 2013; that any work done after that, specifically in November, 2013 was without appellees' permission or knowledge; and that MMS' purpose in returning to the property was to "artificially" extend the deadline to record a mechanic's lien. Cuyahoga Heights argues that MMS made the following false statement in its lien affidavit: "The last of the labor or work was performed or material was furnished to [the Real Property on] November 22, 2013." (Counterclaim at ¶ 13). Cuyahoga Heights asserts that MMS knew that statement was false and that it, Cuyahoga Heights, relied to its detriment on the false statement. It argues, "[b]ecause of [the lien] the Real Property could not be offered as collateral for financing and [Cuyahoga Height's] lender refused to extend financing to [it]. In order to obtain the

28.

necessary financing, [Cuyahoga Heights] had to * * * pay premiums and incur other costs to 'bond off' MMS's Mechanic's Lien, and has been forced to detain significant funds as security for MMS's fraudulent lien." Cuyahoga Heights argues that MMS is liable to it for fraud and tortuously interfering with its business relationship with its lender.

**{¶ 72}** Without comment, the trial court denied MMS' motion for summary judgment.

**{¶ 73}** On appeal, MMS argues that Cuyahoga Heights failed to make a prima facie case as to either counterclaim. As to the fraud claim, MMS argues that Cuyahoga Heights (1) could not demonstrate that MMS made a misrepresentation on the lien affidavit or (2) that it relied upon any misrepresentation to its detriment. As to the tortious interference claim, MMS argues that because Cuyahoga Heights failed to introduce any evidence that MMS knew of its relationship with its lender, that claim failed as a matter of law.

**{¶ 74}** A claim of common-law fraud requires proof of the following elements: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Russ v. TRW, Inc.*, 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (1991).

29.

**{¶ 75}** Whether fraud exists is generally a question of fact. *Interstate Gas Supply, Inc. v. Calex Corp.,* 10th Dist. No. 04AP-980, 2006-Ohio-638, ¶ 84. However, "when the plaintiff fails to produce sufficient evidence from which a jury could find in [its] favor, a motion for summary judgment is appropriate." *Doyle v. Fairfield Mach. Co.,* 120 Ohio App.3d 192, 208, 697 N.E.2d 667 (11th Dist.1997).

**{¶ 76}** There is no allegation that the filing of the lien induced Cuyahoga Heights to pay MMS the amount, or any part thereof, set forth in the lien affidavit. Rather, Cuyahoga Heights claims that the lien interfered with the processing of its loan and its ability to use the property as collateral without "bonding off" the lien. The summary judgment evidence on this point was offered by Cuyahoga Height's property manager, Gregory Scott. At the time the lien was filed, Cuyahoga Heights had been approved for financing with FC Bank, and it had received a "term sheet," setting forth the terms of the loan. The mechanic's lien was discovered when it appeared on the title report, which was prepared in furtherance of the loan. After that, the loan "process ground to a halt." In order to maintain the loan, FC Bank required Cuyahoga Heights to "bond off" the lien. The purchase of the bond allowed the loan to proceed, but with it, came $8,100 in premiums. Cuyahoga Heights also had to place $405,000 into an escrow account as a security for the bond.

**{¶ 77}** On appeal, MMS argues that, even if the last day of work identified in the lien affidavit was fraudulent (which it denies), there is no evidence that Cuyahoga Heights "relied upon that statement to do anything. While Cuyahoga bonded off the lien,

30.

it did not do so in reliance upon MMS' statement of its last day of work. It bonded off the lien so it could obtain financing that it apparently wanted."

{¶ 78} We agree with MMS. "A claim of fraud requires a party to prove that it irretrievably changed its position to its detriment in reliance upon the defendant's false statement(s). *Tier v. Singrey,* 154 Ohio St. 521, 97 N.E.2d 20 (1951) (discussing fraud for purposes of admitting evidence normally barred by the statute of frauds). "The Ohio Supreme Court has held that a party cannot maintain an action for fraud when the fraudulent representations were not made to him to induce him to act." *Moses v. Sterling Commerce Am., In*c., 10th Dist. Franklin No. 02AP-161, 2002-Ohio-4327, ¶ 15, citing *Wells v. Cook*, 16 Ohio St. 67 (1865) syllabus; *Sooy v. Ross Incineration Servs, Inc.,* 9th Dist. Lorain No. 98CA007031, 1999 Ohio App. LEXIS 4889 (Oct. 20, 1999) ("A plaintiff fails to state a valid cause of action for fraud when he alleges that a third-party relied on misrepresentations made by a defendant and that he suffered injury from that third-party's reliance.")

{¶ 79} Cuyahoga Heights cannot recover damages on the theory of fraud, based upon FC Bank's changing the terms of the loan with Cuyahoga Heights, even if the lien was the cause of the bank's decision. The costs incurred by Cuyahoga Heights, in defending and bonding off the lien, were not made in reliance upon any false statements by MMS. *See e.g., Ruscilli Constr. Co. v. Major Builders Serv*., Franklin C.P. No. 11-CV-12467, 2013 Ohio Misc. LEXIS 3102, *4-6 (Feb. 27, 2013). In *Ruscilli*, the plaintiff, a general contractor, alleged that the defendant committed fraud by knowingly filing invalid mechanics liens, which caused the property owner to withhold over $265,000 in

31.

payments to the plaintiff and causing the plaintiff to seek a bond. The court granted the defendant's motion for summary judgment, finding that the general contractor could not "recover damages on the theory of fraud based on [the property owner's] reliance upon the statements made by Defendant in the mechanics' liens. The costs incurred by [the general contractor] in defending and bonding off these liens were not made in reliance upon any false statements" by the defendant. *Id.* at \*6. In this case, we find that the trial court erred when it denied MMS' motion for summary judgment as to Cuyahoga Height's claim for fraud because Cuyahoga Heights failed to put forth any evidence that it relied to its detriment on the statements set forth in MMS' lien affidavit.

{¶ 80} In Count 2 of its counterclaim, Cuyahoga Heights alleged that it had a business relationship with its lender, FC Bank; that MMS "had knowledge" of that relationship; that MMS intended to and, in fact, "interfered with [Cuyahoga Height's] financing arrangements by recording the Mechanic's Lien without privilege to do so, given that it was filed past the statutory deadline."

{¶ 81} "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 651 N.E.2d 1283 (1995). A claim for a tortious interference with a business relationship requires proof of (1) the existence of a business relationship; (2) the wrongdoer's knowledge of the relationship; (3) an intentional interference causing a breach or termination of the

32.

relationship; and (4) resulting damages. (Citations omitted.)  *WLB Radiology, LLC v.*

*Mercy Health North, LLC*, 6th Dist. Lucas No.  L-16-1015, 2016-Ohio-5276, ¶ 39.

**{¶ 82}** MMS argues that it was entitled to summary judgment as to this claim

because Cuyahoga Heights failed to establish that MMS knew of its business relationship

with FC Bank or its attempt to finance the property.  MMS denies any such knowledge.

In further support, it cites the deposition testimony of (1) Gregory Scott, who admitted

that Cuyahoga Heights never had any discussions with MMS that it was working with a

lender and (2) Matt Ambrose, who testified that he never had any conversations with

MMS "in connection with Cuyahoga Height's lender."  Once MMS put forth its case, it

became Cuyahoga Height's reciprocal burden to offer evidence showing that MMS *did*

*know* of the relationship between it and FC Bank.  Civ.R. 56(E).

**{¶ 83}** Cuyahoga Heights offered none.  Instead, it cites a line of cases, as did the

trial court, which provide that tortious interference of a business relationship may include

interference with *prospective contractual relationships*.  Those cases rely on the

Restatement of the Law 2d, Torts, Section 766(B) which provides that a defendant may

be held liable for intentional interference with prospective contractual relations "whether

the interference consists of (a) inducing or otherwise causing a third person not to enter

into or continue the prospective relation, or (b) preventing the [plantiff] from acquiring or

continuing the prospective relation."  We find that this section is inapplicable to the case

before us.  As "Comment a" to that section makes clear, Section 766(B) "is concerned

only with intentional interference with *prospective contractual relations,* not yet reduced

to contract.  The rule for the actor's intentional interference with a third person's

33.

performance of his *existing contract* with the plaintiff is stated in § 766." (Emphasis added.)  Section 766 pertains to "Intentional Interference with Performance of Contract by Third Person."  Under that section, the tortfeasor's knowledge of the contract remains an integral component of a successful claim:

> *Actor's knowledge of other's contract.*  To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract.  Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract.  Restat 2d of Torts, § 766 (2nd 1979).

{¶ 84} In this case, Cuyahoga Heights is not arguing that the mechanic's lien interfered with an, as yet unidentified, prospective business relationship.  The basis for Cuyahoga Height's claim is that MMS interfered with a specific business venture, between it and FC Bank, that caused the processing of its loan to "grind to a halt."  Here, there are no facts to suggest that MMS knew of Cuyahoga Height's relationship with FC Bank or of Cuyahoga Height's pursuit of a loan.

{¶ 85} The final case cited by Cuyahoga Heights hurts, rather than helps its case.  In *Casciani v. Critchell*, 1st Dist. Hamilton No. C-140338, 2015-Ohio-977, ¶ 30-32, the court found that an issue of fact existed as to when the defendant, who filed a fraudulent mechanic's lien, learned of the property owner's relationship with its lender.  The defendant claimed that it had no knowledge of the plaintiff's business relationship with

34.

the bank, but the record demonstrated otherwise, as evidenced by the fact that it named the lender in a separate action to foreclose on the mechanics lien. The court found that the trial court erred in granting summary judgment in favor of the defendant. *Id.*

{¶ 86} Based upon Cuyahoga Height's failure to put forth any evidence to demonstrate that an issue of fact existed to show that MMS knew of its relationship with FC Bank, summary judgment should have been granted to MMS as to Count 2 of Cuyahoga Height's counterclaim. *See Lump v. Larson*, 3d Dist. Logan No. 8-14-14, 2015-Ohio-469, ¶ 25 (Competent, credible evidence supports the conclusion that landlord did not possess the requisite knowledge of the tenant's business relationships and contracts to sustain his claim for tortious interference with business relationships claim.).

{¶ 87} Having construed all the evidence and inferences in favor of the non-moving party, i.e., Cuyahoga Heights, we find that reasonable minds must conclude that Cuyahoga Heights cannot prevail on either its fraud or intentional interference claims for the reason that there are no genuine issues as to any material facts and MMS is entitled to judgment as a matter of law. Therefore, MMS' third assignment of error, that summary judgment should have been granted in its favor as to these claims, is well-taken.

{¶ 88} In light of our finding as to the third assignment of error, MMS' sixth assignment of error, which challenges the trial court's ruling after the bench trial, in favor of Cuyahoga Height's as to their counterclaims, is moot. For the record, we note that Cuyahoga Heights put forth no evidence at trial to establish the missing elements of their respective counterclaims, i.e. there was no evidence at trial of detrimental reliance to support its fraud claim and/or knowledge by MMS of its relationship with FC Bank to

35.

support is intentional interference claim. Accordingly, Cuyahoga Height's claim for fraud and intentional interference are dismissed. We vacate the trial court's award of $63,570 in damages in favor of Cuyahoga Heights and against MMS as to those claims.

{¶ 89} Assignments of error four and five concern the trial court's findings, following the trial, as to MMS' breach of contract claim. In Count 1 of the complaint, MMS alleged that CR-One "significantly changed the scope of the work to be performed under the Agreement" and "failed and refused to perform its contractual obligations under the Agreement." As a result of CR-One's alleged breach of contract, MMS alleged damages in the amount of $269,960, over and above the contract price of $118,340. On appeal, MMS claims that the trial court erred when it failed to construe the parties' written contract pursuant to its terms (assignment of error number four) and when it found that the appellees did not waive the change order provision (assignment of error number five).

{¶ 90} In an appeal from a civil bench trial, we generally review the trial court's judgment under a manifest-weight standard of review. *United States Fire Ins. v. Am. Bonding Co.*, 1st Dist. Hamilton Nos. C-160307 & C-160317, 2016-Ohio-7968, ¶ 16-17. We weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St. 3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. Where, however, the trial court's judgment is based upon a question of law, we review the trial court's determination of that issue de

36.

novo. *See Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St. 3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 34; *see also Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81, 10 Ohio B. 408, 461 N.E.2d 1273 (1984) (holding that a finding of an error of law is a legitimate ground for reversal). We begin with the formation of the contract itself. To constitute a valid contract, there must be a meeting of the minds of the parties, and there must be an offer on one side and an acceptance on the other side. *Noroski v. Fallet*, 2 Ohio St.3d 77, 442 N.E.2d 1302 (1982). The contract must also be supported by consideration which may consist of some benefit accruing to the promisor, in return for which he makes a promise, or some detriment suffered by the promisee, in return for which the promise is made to him. *Id.*

{¶ 91} As set forth in paragraph 2 of the contract, CR-One promised that, "[f]or performing the scope of work, [MMS] will be paid * * * the following amount, not-to-exceed amount of: $118,340.00." In exchange and pursuant to paragraph 4, MMS promised that the "following provisions are included in this subcontract agreement, including but not limited to:"

Item #          Inclusion Description

1. Wash ceiling deck with Greak lakes Extra Muscle PrePaint TM to remove dirt, oil, grease and flaking paint

2. Spot prime rusted areas with Devguard 4360

3. Apply [illegible] 4380 Drywall Epoxy to deck, walls and columns.

4. Need temperature of 50 degrees at the interior of building

37.

5. Clean up.

6. One year Warranty from date of completion.

**{¶ 92}** The record demonstrates that Brandan McGarry, on MMS' behalf, executed the contract on March 7, 2013 and sent it to CR-One. Ambrose signed the contact on April 5, 2013 and returned it to MMS. A signature on a contract is evidence that the minds of the parties met on the terms of the contract as executed. *Parklawn Manor, Inc. v. Jennings-Lawrence Co.,* 119 Ohio App. 151, 197 N.E.2d 390 (10th Dist.1962) (Noting that such an inference is rebuttable.). Thus, the contract became effective when MMS received the fully executed agreement from Ambrose, if not sooner, i.e. on April 5, 2013 when Ambrose signed it. *Indus. Heat Treating Co. v. Indus. Heat Treating Co.*, 104 Ohio App.3d 499, 509, 662 N.E.2d 837 (6th Dist.1995) (Under Ohio law, there is no general rule "that requires a contract to be physically delivered before it is binding on the parties without an agreement to the contrary.")

**{¶ 93}** In its fourth assignment of error, MMS challenges the trial court's interpretation of the contract's use of the term "scope of work." The contract does not define the term "scope of work."

**{¶ 94}** "In construing a written instrument, the primary and paramount objective is to ascertain the intent of the parties so as to give effect to that intent." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53, 544 N.E.2d 920 (1989). We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. *Id.* When the terms of a contract are unambiguous,

38.

courts will not, in effect, create a new contract by finding an intent not expressed in the clear language employed by the parties. *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992), syllabus. The initial determination of whether an ambiguity exists presents a question of law subject to a de novo review. *Autlman*.

{¶ 95} We agree with MMS that the term, "scope of work" is unambiguous and that, in exchange for the contract amount of $118,340, MMS agree to perform the services listed in paragraph 4. Indeed, MMS agrees that it promised "to undertake five specific items as its scope of work." MMS complains, however, that CR-One "significantly changed the scope of work to be performed."

{¶ 96} Throughout its decision, the trial court voiced its disagreement with the notion that CR-One changed the scope of the work. The court made a number of findings to that effect, including that: it was MMS that dictated the means and methods of how to clean, prime and paint phase I; that it was MMS that unilaterally decided to change those methods without input or directive from CR-One; that the "changed conditions" regarding "blowing down" the surfaces (rather than power washing) and spot priming (rather than priming all of the areas) were anticipated prior to execution of the contract; and that prior to execution of the contract that MMS assured CR-One that blowing down the surface would not result in extra cost.

{¶ 97} "[A]n appellate court gives due deference to the trial court's findings of fact, so long as they are supported by competent, credible evidence." *The Four Howards, Ltd. v. J & F Wenz Road Investment, L.L.C*, 179 Ohio App.3d 399, 2008-Ohio-6174, 902 N.E.2d 63, ¶ 63 (6th Dist.). The record demonstrates that MMS provided the services it

39.

was obligated to provide under paragraph 4, albeit at a much higher cost than called for under the contract. MMS has not put forth a legal argument, much less facts to support that argument, that would allow it to recover any amount over the contract price against CR-One (excluding the $7,000 award for MMS' delay claim, which is not subject to an appeal).

{¶ 98} While the record makes clear that MMS, through Sean, identified $85,400 in additional costs, as of March 25, 2013, there is no evidence that CR-One ever agreed to pay those costs. Moreover, the parol evidence rule bars evidence suggesting that there existed any implied contract altering the provisions of the written contract. Any conversation or exchange of emails that occurred before the parties entered into a written contract on April 5, 2013, is subject to the parol evidence rule. The rule provides that, "'absent fraud, mistake, or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Galmish v. Cicchini*, 90 Ohio St.3d 22, 26, 734 N.E.2d 782 (2000), quoting 22 Williston, Contracts, (4 Ed.1999) 569-570, Section 33:4. The purpose of the rule is to protect the integrity of written contracts. *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 662 N.E.2d 1074 (1996). "By prohibiting evidence of parol agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments." *Galmish* at 26. Accordingly, extrinsic evidence cannot contradict the unambiguous terms of a final, written agreement. *Id*.

40.

{¶ 99} The trial court's findings, that CR-One did not change the scope of work, is supported by clear and convincing evidence. MMS' fourth assignment of error is not well-taken.

{¶ 100} In its fifth assignment of error, MMS argues that the trial court's finding – that CR-One did not waive the written change order requirement – was against the manifest weight of the evidence. Paragraph 13 of the contract governs "change orders." It provides,

> The General Contractor * * * may make changes to the scope of work as part of this Subcontractor Purchase Agreement, adding, deleting; revising the Subcontract sum and time. Prior to starting any requested change order work, the General Contractor will issue a Request for Proposal, within 5 days after the request, the Subcontractor shall prepare a written proposal detailing the labor, material and mark-up of the change. The General Contractor will submit the proposal to the Architect/Owner for approval. If the Architect/ Owner accept the proposal; the General Contractor will issue a Notice to Proceed with Change and Subcontract Contract Change Order.

{¶ 101} The contact's change order provision, as set forth in paragraph 13, is valid and binding on the parties. *Cent. Allied Enters v. Adjutant Gen. Dept.,* 10th Dist. Franklin No. 10AP-701, 2011-Ohio-4920, ¶ 26-28. Pursuant to that provision, MMS could not recover for extra work unless it first submitted a "written proposal detailing the labor, material and mark-up of the change" and then, could not perform extra work

41.

without a written "notice to proceed" from CR-One. *Accord, Foster Wheeler Enviresponse v. Franklin Co. Convention Facilities Auth.,* 78 Ohio St.3d 353, 360, 678 N.E.2d 519 (1997).

{¶ 102} In its decision, the trial court made a number of findings with regard to the change order provision, including: (1) that there were "no change orders during this project;" (2) that there were no "written directives in compliance with the change order provision;" (3) that there were no requests for proposal under paragraph 13; and (4) that CR-One did not agree to any cost increases. We defer to the trial court's findings of fact, as we find that they are supported by competent, credible evidence. *The Four Howards,* 179 Ohio App.3d 399, 2008-Ohio-6174, 902 N.E.2d 63, at ¶ 63.

{¶ 103} In lieu of arguing that a valid change order existed, MMS argues that the change order provision was waived. A change order may be waived "either in writing or by such clear and convincing evidence as to leave no reasonable doubt about it." *Foster Wheeler* at 364. "Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional." *Glidden Co. v. Lumbermens Mut. Cas.* Co., 112 Ohio St.3d 470, 2006-Ohio-6553, 861 N.E.2d 109, ¶ 49. A party asserting waiver must prove it by establishing a clear, unequivocal, decisive act by the other party, demonstrating the intent to waive." *Maghie & Savage, Inc. v. P.J. Dick In*c., 10th Dist. Franklin App. No. 08AP-487, 2009-Ohio-2164, ¶ 27. (Additional citations omitted.)

{¶ 104} MMS failed to prove that CR-One waived the change order provision, either in writing or with clear and convincing evidence. Mere knowledge of a

42.

subcontractor's additional work, or even acquiescence of such work, will not support a case of waiver. *Foster Wheeler* at 364. Thus, CR-One's knowledge of MMS' decision to change the means and methods and/or to incur extra costs does not amount to a waiver of the change order provision. *See Dugan & Meyers Const. Co., Inc. v. Ohio Dept. of Admin. Servs.*, 113 Ohio St.3d 226, 2007-Ohio-1687, 864 N.E.2d 68, ¶ 39, citing *Ebenisterie Beaubois Ltee v. Marous Bros. Constr., Inc.,* N.D.Ohio No. 02CV985, 2002 U.S. Dist. LEXIS 26625 (Oct. 17, 2002) ("[W]hen a contract has an express provision governing a dispute, that provision will be applied; the court will not rewrite the contract to achieve a more equitable result.").

{¶ 105} When cost overruns substantially increased the cost of the project for MMS, it attempted to pass along those costs to CR-One either by renegotiating the existing contract or negotiating new contracts for other phases of the project. CR-One, through Ambrose, did not accept MMS' repeated attempts to recover those costs and CR-One never agreed to any change in its terms in writing, as required by the contract. Upon review, we find insufficient evidence in the record of a clear and unequivocal act demonstrating CR-One's intent to waive the change order provision. MMS' fifth assignment of error is not well-taken.

{¶ 106} In MMS' seventh and final assignment of error, it argues that the trial court erred in sanctioning it for frivolous conduct, pursuant to R.C. 2323.51. In its decision, the trial court cited two instances of frivolous conduct by MMS: its "persistent maintenance of claims premised on a late-filed Mechanic's Lien" and its "filing of motions and papers accusing Ambrose of dishonesty under oath * * * result[ing] in

43.

extensive briefing." The trial court ordered the parties to brief the issue of attorney's fees and costs attributable to that frivolous conduct.

{¶ 107} Appellees submitted an affidavit and billing records seeking $65,419.26 in sanctions. MMS did not respond to that issue, but on January 24, 2017, it filed a motion to stay all proceedings, pending its appeal. The court granted MMS' motion. Thus, no finding with regard to sanctions has been made.

{¶ 108} A ruling on a contempt motion is not a final appealable order unless the trial court has made a specific finding of contempt and has imposed a penalty or sanction. *Kimani v. Nganga*, 11th Dist. Lake No. 2009-L-060, 2009-Ohio-3796, ¶ 3-4. *See also Heckathorn v. Heckathorn*, 5th Dist. Stark No. 2006CA189, 2007-Ohio-5520, ¶ 8.

{¶ 109} Here, although the appealed judgment made specific findings of frivolous conduct, no sanction has yet been ordered. Until a second order is entered by the trial court as to the amount of damages, the issue of contempt is not ripe for review. *Kimani* at ¶ 4, citing *Welch v. Welch*, 11th Dist. No. 2004-L-178, 2005-Ohio-560, ¶ 5. Accordingly, MMS' seventh assignment of error is not well-taken.

{¶ 110} In conclusion, we affirm the trial court's judgment, in part, and we reverse, in part. As set forth above, we find MMS' first, fourth, fifth, sixth and seventh assignments of error not well-taken. We find MMS second assignment of error well-taken, but as discussed, the error by the trial court was harmless. Finally, we find MMS' third assignment of error, regarding its motion for summary judgment, to be well-taken. MMS is entitled to judgment as a matter of law as to Cuyahoga Height's counterclaims.

44.

**{¶ 111}** The parties shall share the costs of this appeal equally pursuant to App.R. 24.

Judgment affirmed, in part
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                               _____

                                                          JUDGE

Thomas J. Osowik, J.

                                                   _____

Christine E. Mayle, P.J.                                 JUDGE
CONCUR.

                                                          _____

                                                          JUDGE